ROBERT F. JORDAN *v.* LINDA S. JORDAN

[No. 345, September Term, 1981.]

*Decided January 7, 1982.*

The cause was argued before MORTON, MOYLAN and LISS, JJ.

*James J. Cromwell* and *Beverly A. Groner,* with whom were *Spriggs, Cromwell, Myers, Nicholson & Spire, P.A.* and *Groner & Groner, Chartered* on the brief, for appellant.

*Jeffrey N. Greenblatt,* with whom were *Brodsky, Greenblatt & Renehan, Chartered* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

Robert F. Jordan and Linda S. Jordan, appellant and appellee, respectively, were married on June 15, 1963 in Hartford, Connecticut. In September of 1976 the parties separated voluntarily and on November 17, 1977, executed a separation and property settlement agreement, under the terms of which they agreed that the custody of their two minor sons, Christopher, born December 12, 1966, and Garrett, born August 31, 1972, was to be with the mother. The agreement provided, *inter alia,* for detailed visitation rights by the father and the mother agreed that the father was to have "free access and unhampered contact with the children." The parties were subsequently divorced by a decree *a vinculo matrimonii* on April 28, 1978. The separation and property settlement agreement was merged into the divorce decree.

Both minor children thereafter resided with their mother in the former marital home in Potomac, Maryland. The appellant remarried and moved to Darien, Connecticut. Subsequently, Christopher had moved by his own request and by agreement of the parties to the custody of the appellant in Connecticut, while Garrett remained with his mother in Maryland. Although, as was perhaps to be expected, some friction arose in the implementation of the father's visitation rights with the younger child, no serious problem occurred until September 1, 1979, when the appellant filed a petition for custody of both minor children and for other relief including prayers that: (1) the Circuit Court for Montgomery County ratify the then existing custody of the minor child Christopher in the appellant; (2) the appellee be enjoined from removing either of the said minor children from their

respective places of abode in Connecticut and Maryland except for the implementation of visitation rights until the matter of custody had been finally determined by the court; (3) the court pass an appropriate order as to visitation rights; (4) the court make an appropriate award for support of the minor children; (5) the court award the appellant counsel fees; (6) the case be advanced for hearing; and (7) the court grant the appellant such other and further relief as the court deemed just and proper. On the same date the bill of complaint was filed, the chancellor signed an ex parte order granting custody of Christopher to the appellant, enjoining the appellee from removing either of the children from their respective places of abode, except for visitation until the controversy had been finally adjudicated, and ordered the existing plan for visitation to continue.

On November 26, 1979, appellee filed an answer to appellant's petition in which she prayed: (1) the court to dismiss appellant's bill of complaint; (2) that the injunction and order of September 11, 1979 be dissolved; (3) that all costs and legal fees incurred by appellee be paid by the appellant; and (4) for such other and further relief as the court might deem just and proper.

On May 5, 1980 appellant filed a supplemental amended petition in which he requested the court to grant the relief prayed in the original petition and grant him custody of both minor children with appropriate rights of visitation reserved to the appellee. On October 14, 1980, after a series of hearings extending over a period of several months, the chancellor ordered that the injunction previously issued against the appellee be dissolved effective October 17, 1980. Appellant noted an appeal on October 16, 1980. On the same date appellant filed a petition to stay operation of the chancellor's interlocutory order dissolving the injunction previously issued on September 11, 1979, pending the disposition of the appeal to this Court. An answer to this petition was filed by the appellee and the petition to stay was heard by this Court on October 17, 1980. We ordered that the appellant's motion to stay the chancellor's order of October 14, 1980 dissolving the injunction previously entered

against the appellee be granted with the additional provision that the stay remain in effect until the issues on appeal were resolved in this Court.

On October 31, 1980, the chancellor signed an order dissolving the injunction entered on September 11, 1979 (effective October 17, 1980); granting custody of Christopher to the appellant; reserving reasonable visitation rights to the appellee; denying appellant's request for change of custody of Garrett; allowing the appellee to move outside the United States with Garrett; permitting appellant visitation with Garrett both in and outside the United States; accepting the parties' stipulation concerning support for the minor child; ordering the appellant to pay the appellee $2,225 as suit money; ordering the appellant to pay appellee $20,000 in counsel fees and court costs; ordering that the award of counsel fees and court costs be paid from appellant's share in the proceeds of the sale of the marital home, when sold; and denying appellant's petition for contempt. Appellant seasonably filed an appeal to this Court from the order of October 31, 1980. On December 2, 1980 a revised order was issued by the chancellor exactly duplicating the order of October 31, 1980, except that the trial court's prior order of October 31, dissolving the injunction entered against the appellee on September 11, 1979, was made subject to this Court's order of October 17, 1980 that stayed the effect of the dissolution pending the resolution of the appeal to this Court. From the judgments as set out in the chancellor's revised order of December 2, 1980 this appeal has been seasonably filed.

Appellant has raised five issues to be decided by this appeal:

I. Whether the chancellor erred as a matter of law when he awarded custody of Garrett Jordan to the appellee in the absence of any finding by the chancellor that such an award would be in the best interests of the child?

II. Whether the chancellor erred as a matter of law when he found that the appellant had not shown that a change of circumstances had occurred which justified the transfer of Garrett Jordan's custody from the appellee to the appellant?

III. Whether the chancellor abused his discretion by keeping the custody of Garrett Jordan separate from that of his brother Christopher?

IV. Whether the chancellor abused his discretion when he awarded custody of Garrett Jordan to the appellee in a manner that drastically reduces, without justification, Garrett's and appellant's rights of visitation with each other and impinges harmfully on Garrett's relationship with his brother Christopher, by allowing the removal of Garrett 8,000 miles away to South Africa?

V. Whether the chancellor erred in awarding an attorney's fee of $20,000 to the appellee when (a) the only proof of any fee was in an amount almost $1,000 less than that awarded, (b) the amount of time billed was substantially inflated and (c) no part of the total fee was charged to appellee herself although her independent financial earning power was not disputed?

## I., II., and IV.

We shall consider these three issues raised by this appeal together. Appellant concedes that he has the burden of showing that strong reasons exist for changing the child's custody. *See Vernon v. Vernon,* 30 Md. App. 564, 354 A.2d 222 (1976). He also, at least tacitly, agrees that a custody determination by a chancellor below is not reversible unless against the manifest weight of the evidence or "clearly contrary" to the best interests of the child. *See Feldman v. Feldman,* 55 Mich. App. 147, 222 N.W.2d (1974). As Judge Digges said, in *Davis v. Davis,* 280 Md. 119, 372 A.2d 231 (1977):

> [I]t is within the sound discretion of the chancellor to award custody according to the exigencies of each case, [citation omitted] and as our decisions indicate, a reviewing court may interfere with such a determination only on a clear showing of abuse of that discretion. [280 Md. at 125].

The reason why the chancellor is vested with such broad discretion is:

> [B]ecause only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor. [*Id.,* at 125].

The Court of Appeals reaffirmed the standards enumerated in *Davis, supra,* in *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977), wherein it said:

> It is not enough that the appellate court find that the chancellor was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion the chancellor exercised was clearly abused. [280 Md. at 186].

It is clear from our reading of the extensive testimony included in the several volumes of the record extract filed in support of this appeal that the appellant had no serious complaint concerning the care furnished Garrett by his mother until he was advised that the appellee was contemplating marriage to her fiancé and was proposing to move to South Africa with her husband and the child for a comparatively long period of time. It is not seriously contended that Garrett, at the time of the filing of the petition for custody, was not a happy, healthy, well adjusted child. At no point in the course of these long and drawn out proceedings has the appellant suggested that the mother is not a proper person to have the care and custody of Garrett. Appellant urges that the suggested removal of Garrett to South Africa is in and of itself a sufficient change in circumstances to justify a change in custody. We do not agree. This Court, in *Sartoph v. Sartoph,* 31 Md. App. 58, 354 A.2d 476 (1976) (Davidson, J.) discussed the circumstances under which a change in custody should be considered:

The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child. To justify a change in custody, the change in conditions must have occurred which affects the welfare of the child and not that of the parents. The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with children, stability, not change, is in their best interests. [Footnotes omitted]. [31 Md. App. at 66-67].

The burden is on the appellant, who affirmatively seeks action by the chancellor in changing the custody of the minor child, to show why the court should take that action, and, if he fails to meet that burden, the action should not be taken. *See McAndrew v. McAndrew,* 39 Md. App. 1, 382 A.2d 1081 (1978).

Appellant complains bitterly that the chancellor, in rendering his oral opinion, failed to mention that he was making his decision "in the best interests of the child" and that the failure to enunciate these magic words indicated that the chancellor's decision was clearly erroneous. We do not agree. We note that we said in *Hebb v. State,* 31 Md. App. 493, 499, 356 A.2d 583 (1976):

Judges are presumed to know the law. *Samson v. State,* 27 Md. App. 326, 334, 341 A.2d 817, 823 (1975). *See Schowgurow v. State,* 240 Md. 121, 126, 213 A.2d 475, 479 (1965). Absent an indication to the contrary, we must assume that judges apply the law correctly to the case before them.

That the chancellor in this case was well aware of the legal nuances of this hotly contested custody battle is evidenced from a portion of his oral opinion in which he called attention to the original separation agreement between the parties. He noted that the separation agreement provided:

> [T]he best interests and welfare of the parties' children are of paramount consideration for both of them. They should make every effort to foster the respect and love of the children for each other and shall do nothing which in any way would estrange the children from the other party and each shall exert every reasonable effort to retain free access and unhampered contact between the children and each of the parties.

Although the chancellor did not specifically state in his opinion that his conclusion was based on what he perceived to be the best interests of the child, a review of the entire record extract and his lengthy opinion convinces us with unmistakable clarity that he was not clearly erroneous in his implicit application of the "best interest of the child" standard.

Appellant argues vigorously that the chancellor failed to give adequate consideration and weight to the testimony of appellant's witnesses concerning the "horrifyingly un-American way of life" in the society of South Africa to which it was proposed to introduce young Garrett in his pre-adolescent years. Appellant charges that by his decision in this case, the chancellor erred because he implicitly held that the Union of South Africa, "a State whose governmental and legal system is utterly antithetical to that of the United States, is a fine place to bring up an American boy because he would enjoy material wealth there and because appellee's fiancé approves of it." We consider this attack on the chancellor a "cheap shot."

The record extract amply demonstrates that the chancellor gave both sides in this dispute wide latitude in introducing into evidence the opinions of experts as well as other witnesses as to the kind of society which would be found in South Africa. That he weighed this testimony carefully is demonstrated by that portion of his opinion in which he stated:

> *I do not find from the testimony in this case that there is an effort on the part of Mrs. Jordan to*

*eradicate the child from his American heritage. I find only for a limited period of time that Mrs. Jordan and perhaps her new husband, if she elects to marry him, will be living in the Union of South Africa whose policies I hardly approve of, but simply because I disapprove of them, that in and of itself is not sufficient reason for me to forbid her from taking the child to that state, and I expressly say in my order that her custody is not limited to her remaining in the United States, but that she may follow the dictates of her own happiness and marry if she so chooses, and she has custody of Garrett Jordan pending further order of this Court.*

*I find nothing of her action that is an attempt to deprive this child of his right to American heritage. I believe that she will see to it that this child remembers this country, remembers the teachings of our democratic republic, and that when he returns, as I fully anticipate he will, he will be back into step with the thinking, with the feeling, and with the teachings of his heritage.* I do not believe that there is any particular danger that has been demonstrated by the evidence. There is nothing in the testimony of the expert witnesses that indicates that this child is going to be harmed by a sojourn that he has in South Africa. I think the most poignant part of the testimony of Mr. Carlson was that when he was asked how many white, and perhaps he should have been asked foreign born boys of the age of eight years have been arrested for violation of the Terrorism Act, his answer was he knows of none, and this is a strawman that has been raised solely to panic the Court into feeling that his residence in South Africa is going to visit upon him an untold hardship, and his custody shall remain in the hands of Mrs. Jordan subject to the right of Mr. Jordan to have reasonable visitation, and that reasonable visitation I define as being no less than one month during every calendar year. That month to

> be during that portion of the year when he is having his vacation from his schooling. His father shall have the right of such further visitation as he may reasonably elect to have. He may visit him in South Africa. He may visit him by bringing the boy to the United States and having him for periods of time not interfering with his schooling and his other reasonable activities as he wishes during the course of the year. [Emphasis added].

Like the chancellor, we are not impressed by the suggestion of possible physical danger to this young man during his sojourn in South Africa. In today's world, if we permitted parents to take their children only to those countries of whose political systems we approve, or where no possible threat of violence could occur, we would probably have to limit travel to the regions of outer space and might even have to disqualify Potomac, Maryland and Darien, Connecticut.

We find no abuse of discretion by the chancellor in his decision to permit Garrett to move with his mother to Bryanston, South Africa. There was evidence in the case which, if believed, could have established that the standard of living, the religious, educational, athletic and medical facilities available in Potomac, Maryland and Bryanston, South Africa, were similar and clearly adequate and that there were many children of Garrett's age with whom he could associate. Nor do we find any clearly erroneous application of the applicable legal principles.

The great weight of authority in this country permits a minor child to move freely with the custodial parent. In *Hoyt v. Boyar,* 5 F.L.R. 2135 (N.Y. Fam. Ct., Sullivan County, 1979, *modified,* 77 A.D.2d 685, 429 N.Y.S.2d 792 (1980), the court found that both parents were responsible, capable, and willing to provide a better than average life for their child. Under circumstances where the mother to whom custody had been previously granted desired to move to Puerto Rico with her new husband, the fact that the court could find no fault with the mother's request was evident where the court stated:

Relocating as a result of remarriage, employment and the like cannot of itself render a parent to whom custody has been granted unfit and thereby constitute the basis for a modification of custody. See Matter of Susan "KK" v. Rudolpho "KK", 39 A.D.2d 792 (3d Dept. 1972). [5 F.L.R. at 2135-6].

The Supreme Court of Connecticut had before it recently a case in which similar arguments were raised and answered in an opinion permitting the mother to remove the parties' minor child to Italy. In *Prescutti v. Prescutti,* 6 F.L.R. 2795 (Conn. Sup. Ct. 1980), the father argued that if the child were permitted to live in Italy the consequences would be that: (1) the court would lose effective control over the child; (2) the child would be effectively expatriated and lose his right to be raised as an American; and (3) the father's reasonable visitation would be rendered illusory. The Court noted that it had continuing jurisdiction over the minor child.[1] Although the Court recognized that it was more cumbersome to control the situation where the custodial parent resided outside the country, the Court held that it would be inaccurate to say that in such cases the court loses all control over the child. The Court further held:

We do not believe that the difficulty of enforcing the present order or subsequent orders that may be made concerning the child is a sufficient ground upon which to conclude that the court abused its discretion in the award of custody where the best interests of the child are otherwise promoted by the award. [6 F.L.R. at 2796].

Similarly, the Supreme Court of Oklahoma, in *Miracle v. Miracle,* 360 P.2d 712 (Okla. 1961), decided that a mother should not lose her right to custody because she lived in Italy and her husband argued that it was in the child's best interests to be reared in the United States and to receive the

---

1. Maryland law is precisely the same. *See* Glading v. Furman, 282 Md. 200, 383 A.2d 398 (1978); Seidlitz v. Seidlitz, 23 Md. App. 327, 327 A.2d 779 (1974).

benefits of its history and ideals. The Court found that it could not "bottom" its judgment on what might happen in the future, but retained continuing jurisdiction to modify the order if necessary.

We note that in the case *sub judice* the appellee offered to permit Garrett to visit with his father and brother during all the 77 days he was not attending school and offered to defray one-half the cost of transportation. The fact that visitation would become more difficult does not amount to such a change in circumstances as would justify the chancellor in changing custody from the mother to the father in this case. *See Alcorn v. Alcorn,* 388 S.W.2d 578 (Ky. 1965), in which the court permitted the mother to remove the parties' eight-year-old child to Okinawa. *Accord, Byers v. Byers,* 370 S.W.2d 193 (Ky. 1963), where the court refused to enjoin a mother from taking her two minor children (ages eight and eleven) to Johannesburg, South Africa. The mother in that case was planning to move in order to marry a native of Holland who was employed as a newsman in Johannesburg. *See also Bolenbaugh v. Bolenbaugh,* 89 S.D. 639, 237 N.W.2d 12 (1975), where the Court permitted the removal of the parties' minor child to Scotland.

Appellant offers in support of his position the very recent case of *Daghir v. Daghir,* 441 N.Y.S. 2d 494 (1981). In that case the custodial mother was divorced from the natural father and was awarded custody of their three minor children (ages fifteen, thirteen and nine). The husband was granted visitation rights every Sunday from noon till 7 P.M. and two weeks in the summer. The divorced wife then married an employee of IBM who accepted a two-year work assigment in France. The custodial parent proposed to remove the children to France and the father argued that his right to meaningful visitation would be destroyed by his former wife's efforts to accommodate an *entirely unnecessary career choice* by her new husband. The chancellor denied the father's motion to restrain the removal of the children or in the alternative that he be granted custody, and issued an order increasing summer visitation to 30 days and reducing support payments by $4,000 which

would, in the court's view, permit the father to travel to France to see the children. By a 3-2 majority vote the appellate court reversed.

In stating its reasons for the reversal the Court said "so zealously do the courts guard the relationship between a noncustodial parent and his child that any interference with it by the custodial parent has been said to be 'an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent.'" [Citations omitted]. [441 N.Y.S.2d at 496].

The Court went on to say:

> That is not to suggest, of course, that a custodial parent must scrupulously avoid all conduct which may in any way affect, no matter how slightly, the other parent's right of visitation. Custodial parents have rights as well. Among them is the right to remarry, and we recognize that the obligations of a new marriage may legitimately, if rarely, require even "a dramatic change of locale." *(Weiss v. Weiss, supra,* p. 177, 436 N.Y.S.2d 862, 418 N.E.2d 377). The decision to bear children, however, entails serious obligations and among them is the duty to protect the child's relationship with both parents even in the event of a divorce. Hence, a custodial parent may be properly called upon to make certain sacrifices to ensure the right of the child to the benefits of visitation with the noncustodial parent. The search, therefore, is for a reasonable accommodation of the rights and needs of all concerned, with appropriate consideration given to the good faith of the parties in respecting each other's parental rights. [*Id.,* at 496].

The Court then concluded:

> On balance, therefore, we conclude that the Family Court's determination unreasonably and unjustifiably interferes with Khalil's right to

meaningful visitation and is contrary to the children's essential best interests. Because moving the children to France is not required by any compelling financial, educational, employment or health considerations, and because it would significantly curtail the frequency, and therefore the quality, of what was regular and welcomed visitation, the order appealed from should be reversed. (See *Matter of Whittemore v. Whittemore,* 202 Misc. 175, 109 N.Y.S.2d 216.) Khalil's motion should be granted insofar as it seeks to modify the divorce judgment by adding a provision prohibiting the removal of the children from New York State for purposes of residing elsewhere, without his written consent, and insofar as it seeks a temporary transfer of custody, for so long as Frances shall reside outside of New York State. [*Id.,* at 497].

While we cannot quarrel with the majority's decision in this case we think the dissenting opinion as written by Justice Magnano and joined by Justice Rabin is more clearly in the interests of the minor children than the Hobson's choice created by the majority. The dissent said, in pertinent part,

The order appealed from is fair and reasonable, and attempts a Solomonic solution to the instant dispute. It represents humane sensitivity to the competing interests and concerns of the parties. It abrogates no one's rights, but alters their implementation so as to realistically respond to the changing needs of all. And, most importantly, it appears singularly guided by a desire to ensure the best interests of the children by preserving the stability of their relationship with their custodial parent, by maintaining significant contact between them and their noncustodial parent, and by allowing them to take advantage of expanding opportunities for growth and learning.

It must be emphasized that the custodial parent intended to move her family's home temporarily to

France because her present husband had made a career choice necessitating such a move. It may be true that this career choice was not dictated by any financial or promotional considerations. Nevertheless, the choice was made. The real question, then, is whether the wife must now choose not to accompany her husband in his temporary relocation in order to retain the custody of her children and maintain her former husband's weekly visitation rights, or relinquish custody to the latter in order to fulfill her present marital obligations. This is an impossible choice, which should be avoided, if there can be a reasonable accommodation of the parties' rights. I am convinced that the Family Court's carefully fashioned order effected such an accommodation. [*Id.,* at 498].

We were advised at argument that the appellee in this case has postponed marrying her fiancé pending the outcome of these proceedings. We think it would be cruel and inhumane to require her to choose between her child and her fiancé particularly when the exercise of true love for the child *by both parties* could provide an acceptable accommodation in their best interests and the best interests of the child.

### III.

Appellant next argues that the chancellor abused his discretion by keeping the custody of Chris Jordan, the older brother, separate from that of Garrett, the child involved in this case. He cites the dictum in *Hild v. Hild,* 221 Md. 349, 359, 157 A.2d 442 (1960), wherein the Court of Appeals held:

Ordinarily, the best interests and welfare of the children of the same parents are best served by keeping them together to grow up as brothers and sisters under the same roof.

The short answer to appellant's contention is found in the fact (which the chancellor had before him) that the brothers,

by agreement of the parents, had been separated for a period of more than two years before the father filed his bill of complaint seeking custody of Garrett. The chancellor found that Christopher desired to remain in Connecticut with his father. He also found that in spite of the separation between himself and his father and brother, Garrett was "a well adjusted and thriving young man who seems to be doing very well living with his mother and visiting with his father and brother in Connecticut. There seems to be no physical, no mental, no emotional disability that Garrett has suffered and no demonstration that he will suffer such a disability visited upon him by reason of the fact that he will be living with and in the custody of the mother."

So far as Christopher was concerned, there was testimony consistent with the six year difference in age between the brothers, that before the separation Christopher treated Garrett as a "tagalong." There was no evidence that Garrett suffered any adverse effects during the two-year separation of the brothers. The chancellor had before him conflicting opinions offered by experts as to what effect, if any, the separation of the siblings would have on their relationship. Certainly, if appellant avails himself of the 77 days of visitation which is offered by appellee, the contact between the brothers may well be greater than that afforded by the present weekend visits. We find no abuse of the chancellor's discretion.

## V.

Finally, appellant contends the chancellor erred in awarding appellee's counsel an attorney's fee of $20,000 because: (a) counsel submitted proof of a fee in an amount of almost $1,000 less than that awarded; (b) the bill for time expended was inflated; and (c) no part of the fee was charged to the appellee.

Md. Ann. Code (1957, 1973 Repl. Vol.) art. 16, § 5A provides in pertinent part as follows:

> In all cases where a person makes an application
> for a decree or modification of a decree with respect

to the custody, the amount of support or visitation rights concerning a child or children of the parties, or files any form of proceeding to recover arrearages of child support or otherwise to enforce such decree, the court, *after considering the financial status of both parties, their respective needs* and whether there was substantial justification for instituting or defending the proceeding, may make such award of costs and counsel fees to either party as shall be just and proper under all the circumstances. [Emphasis added].

The question of the amount of counsel fees to be allowed was considered by us in *Foster v. Foster,* 33 Md. App. 73, 364 A.2d 65 (1976), where we said:

In determining the amount for a reasonable counsel fee, the ordinary factors of labor, skill, time and benefit, as well as the financial resources of the parties, must be taken into account. While time is one of the applicable factors, the record need not contain evidence specifically delineating the number of hours spent by counsel. Because the record itself discloses the nature of the proceedings, it is some evidence of the extent of the attorney's efforts. Given this evidence, the chancellor may rely upon his own knowledge and experience in appraising the value of an attorney's services. [Footnotes omitted]. [33 Md. App. at 77].

Based upon these guidelines and our independent review of the record extract we do not and cannot find that the chancellor erred in awarding a $20,000 counsel fee to the appellee in this case.

However, we are in a somewhat different position when we consider whether the appellee should have been required to bear some portion of the attorney's fees. We find nothing in the record from which the chancellor could have determined what the financial status of the parties was, or from which their respective needs could have been assessed. We have no difficulty in concluding that there was substantial

justification for instituting and defending the proceedings. We shall therefore affirm the chancellor's order as to all issues except that we shall remand for a further hearing to determine whether the appellee shall be required to bear some portion of the counsel fees allowed in this case.

*Portion of order as to award of counsel fees vacated and remanded for further proceedings.*
*Remainder of order affirmed.*
*Costs to be paid by appellant.*