598 A.2d 482

**Edward T. GOLDMEIER**

v.

**Beth M. LEPSELTER, et al.**

No. 165, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Nov. 26, 1991.

Richard Bloch (Shiling, Bloch and Baker, P.A., on the brief), Baltimore, for appellant.

John H. Doud, III (Fedder and Garten, P.A., on the brief), Baltimore, for appellees.

Argued before BELL, FISCHER, and DAVIS, JJ.

ROSALYN B. BELL, Judge.

The legal question presented to us by the parties in this appeal is whether the divorced spouse, who seeks to relocate the children, has the burden of proof to demonstrate that the move is in the best interests of the children. That is not, however, the question we need to address. The real question is, under all the circumstances, what is in the best interests of the children? Our answer, in short is: the burden is on the trial judge to weigh the relocation and all its ramifications, together with all the other information he or she can garner, to decide this very difficult question.

There is, however, a larger social question presented by the facts in this case. How can such a relocation be accomplished without pain to the children and both parents? Our answer is, it cannot. This answer is the same regardless of whether the children relocate with the primary custodial parent or there is a change in custody. A superficial answer to this larger question might be, "maintain the status quo, don't relocate," but the social and economic reality is that people must and do move.

According to the latest United States Department of Commerce study of Geographical Mobility, one out of every

six persons moved during the 12–month period from March, 1986 to March, 1987. Relocation is visited with various results on the children of divorced couples, regardless of which natural parent moved or whether the children themselves moved or not. By and large, moving is not a totally positive experience for children. *See* P.M. Raines, *Joint Custody and the Right to Travel: Legal and Psychological Implications*, 24 J.Fam.L. 625 (1985–86).[1] In her arti-

---

1. Raines writes, in pertinent part:
   "While the 'right to travel faction' recognizes that the states have an historical and ethical obligation to serve the child's welfare, it argues that travel should be restricted only where specific harm to the child would occur if the move were allowed. Objections to the contrary notwithstanding, this viewpoint elevates parental rights and custodial autonomy over the child's best interest by placing the burden of proof upon the parent who is opposing the move to show that the child will be 'significantly injured' by the change of residence. For a generation of parents who have grown up during a period of our history referred to by one author as the 'Culture of Narcissism,' an era in which personal and at time selfish values have predominated over altruistic or family values, such a viewpoint allows a custodial parent to move almost at whim. Focusing on parental rights and needs—such as more money, better promotional opportunity or a new marriage—necessitates ignoring the wisdom to be found in psychological studies: two parents are better than one."

   \*   \*   \*   \*   \*   \*

   "A concurrent problem is the courts' reluctance to interview children in order to allow the decision-maker to determine a child's needs and desires. Although most states have statutes which provide for or allow such interviews, judges frequently feel uncomfortable talking with the affected children. Therefore, any information concerning the child's best interest which the court receives is presented through the distorted filter of the advocacy model. Both sides attempt to 'psyche out' the judge, and gear their own perspectives of the children's best interest as closely as possible to their perceived impressions of the court's bias.

   "The case-by-case analysis of best interest and right to travel which has evolved from the two judicial perspectives and from the competing interests of parents provides no answers for a complex question. Today, best interest determinations in right to travel cases depend more on the jurisdictional precedent and the impression of a specific judge than on either the self-reports of the affected children or on the general finding of social scientists concerning the impact of post-divorce family configurations and parental moves on children...."

   24 J.Fam.L. 633–34, 635–37 (citations omitted).

cle, Raines discusses the diverse ways that courts, legisla-
tors, legal commentators and parents have responded to the
problem of parent mobility.  She notes that there is no one
method utilized in solving the problems created by joint
custody in a mobile society.  Often the arguments are
distilled down to a conflict between the parent's constitu-
tional right to travel versus the best interests of the child.

We might hope that those who are on the brink of divorce
will understand that in all probability one or both parents
will move during the children's minority, making the shar-
ing of the daily lives of those children impossible for one of
the parents.  It has been said there are no winners in a
divorce.  That can never be more clear than in this case.

Edward Goldmeier and Beth Goldmeier (now Lepselter)
were divorced by a judgment of the Circuit Court for
Baltimore County in 1988.  We know little of their life
together prior to the divorce, beyond the fact that two sons
were born of the marriage, Joshua, now aged 10, and
Daniel, now seven.  Incorporated into the divorce judgment
was the parties' marital settlement agreement, which pro-
vided in part that the parties

> "agree to adopt joint custody, and hereby designate wife
> as primary physical custodian....  The parties also agree
> to adopt the practices and principles of joint legal custo-
> dy....  In the event that either party anticipates a move
> from the immediate Baltimore, Maryland, area then that
> Party shall notify the other at the earliest practical time
> and the issue of custody shall be reopened."

The parties lived up to that sharing of responsibility,
addressing both the physical and emotional needs of the
children in the best sense of the word.  Despite the hostility
this present action has generated, neither could, nor did, say
the other was not a fit and proper person to have custody of
the boys.  The closest they came was Mr. Goldmeier's
contention that on several occasions Ms. Lepselter was
inflexible and screamed at him in front of the children.  Ms.
Lepselter claimed that Mr. Goldmeier—although he had the
children a minimum of three weekends out of four, every

Wednesday evening and substantial vacations in the winter and summer—did not take care of the children's real needs, but instead concentrated on "fun" activities.

In late January, 1990, Mr. Goldmeier was told by Ms. Lepselter that she, Mr. Lepselter, the Lepselters' baby daughter and Mr. Goldmeier's two sons planned to relocate to Dallas, Texas, where Mr. Lepselter had obtained employment. On February 1, 1990, Mr. Goldmeier filed petitions seeking an ex parte injunction and a change in custody of the boys. An ex parte order was signed on February 2, 1990 and renewed on February 9, 1990. The orders enjoined Ms. Lepselter from moving the two boys from Baltimore County.

An emergency hearing was held on February 22 and 23, 1990. At the conclusion of a two-day evidentiary hearing, the trial judge issued an oral opinion. That opinion, as modified, enjoined Ms. Lepselter from removing the Goldmeier children to Dallas until she received permission from the Circuit Court for Baltimore County, although the children could still reside with her in Baltimore County. If Ms. Lepselter moved out of Baltimore County, the children would live with Mr. Goldmeier. In addition, the court stated it intended to appoint counsel to represent the children to investigate and recommend the relief that should ultimately be granted, *i.e.*, "whether the children should relocate to Dallas with their mother with reasonable visitation to their father, or whether it is in the best interest of the children that they remain here in the Baltimore County area and not be relocated to Dallas."

The court issued an order on March 6, 1990 which enlarged the scope of the oral opinion of March 2, 1990 by ordering the Support and Custody Division of the Circuit Court for Baltimore County to

"investigate the defendant's plans for her family's change of residence and furnish this Court with a written report and recommendation on the issue of whether the defendant's plans are in the best interests of Joshua and [Daniel] Goldmeier...."

Ms. Lepselter chose to remain in the Baltimore County home with the children for the remainder of the school year. Mr. Lepselter made the move to Texas because he was committed to do so.

After the filing of *Johnson v. Domingues*, 82 Md.App. 128, 570 A.2d 369 (1990), which held that relocation did not warrant a change of custody absent evidence that the move would adversely affect the children, Ms. Lepselter moved for a reconsideration. A hearing was held on May 31, 1991 after the court-ordered reports were received from Philip Dantes, the children's attorney, and the Support and Custody Division.

At the May 31, 1990 hearing, at which argument was heard from counsel for both parties, Mr. Goldmeier's petition to enjoin the move to Dallas was denied and a visitation schedule was agreed upon for the ensuing year. Mr. Goldmeier then sought a reconsideration which was also denied. On October 22, 1990, the court issued an order denying Mr. Goldmeier's petition for change of custody and dissolving the injunction granted earlier.

Mr. Goldmeier has appealed, contending, that in this case, the parents of the minor children have joint custody. The agreement incorporated into the divorce decree states: "In the event that either party moves from the immediate Baltimore, Maryland[,] area ... the issue of custody shall be reopened." He contends that the relocation constitutes a change in circumstances and the relocating parent must demonstrate that the move is in the best interests of the children.

## THE CHANGES IN CASE LAW

■ A complicating factor in this case is that, while it was pending, the law with respect to custody and relocation was still evolving. When the injunction in the case now before us was first sought, the leading cases in the field were *Sartoph v. Sartoph*, 31 Md.App. 58, 354 A.2d 467, *cert. denied*, 278 Md. 732 (1976), and *Jordan v. Jordan*, 50

Md.App. 437, 439 A.2d 26, *cert. denied,* 293 Md. 332 (1982). *Sartoph* dealt with the effect a change must have before it dictates a change of custody. *Jordan* dealt with the effect a change of location must have before it dictates a change of custody.

In *Sartoph,* 31 Md.App. at 67, 354 A.2d 467, we said:

"The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child. To justify a change in custody, a change in conditions must have occurred which affects the welfare of the child and not of the parents. The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with children, stability, not change, is in their best interests."

The issue of relocation came before this Court in *Jordan,* where the parent with physical custody sought to relocate to South Africa. Despite vigorous objection from the other parent, we held that the contemplated move was not, in and of itself, a sufficient change in circumstances to require a change in custody. In *Jordan,* 50 Md.App. at 447, 439 A.2d 26, we quoted with approval the case of *Hoyt v. Boyer,* 5 F.L.R. 2135, 2135–36 (N.Y.Fam.Ct., Sullivan County, 1979), *modified,* 77 A.D.2d 685, 429 N.Y.S.2d 792 (1980), where it was stated:

" 'Relocating as a result of remarriage, employment and the like cannot of itself render a parent to whom custody has been granted unfit and thereby constitute the basis for a modification of custody.' " (Citation omitted.)

After the injunction in the instant case was issued on March 2, 1990, our opinion in *Johnson* was filed. In *Johnson,* the spouse with physical custody sought to relocate, ironically, to Texas. Using the precedent established by *Sartoph* and *Jordan,* we again held that the move, by itself,

did not warrant a change in custody, absent evidence that the move would have an adverse effect on the children. No additional analysis was needed or warranted. *Johnson*, 82 Md.App. at 136, 570 A.2d 369.

In the instant case, the trial court entered its ruling on May 31, 1990, recognizing that certiorari had been granted in *Johnson* on April 11, 1990, but without knowing that the Court of Appeals had also granted a stay of our mandate in that case. While the appeal in the case now before us was pending, the Court of Appeals on August 21, 1991 reversed our holding in *Johnson*. *Domingues v. Johnson*, 323 Md. 486, 593 A.2d 1133 (1991). It also decided *McCready v. McCready*, 323 Md. 476, 593 A.2d 1128 (1991). With the reversal of *Johnson*, and the opinion in the companion *McCready* case, the focus in relocation cases has now shifted.

Prior to *Domingues* and *McCready*, the trial court was not required to conduct a full evaluation of the "best interests" of the child, absent a showing that there would be an adverse effect on the child. It was up to the parent seeking a change in custody as a result of relocation to demonstrate the specific harm that would result to the child. *Jordan* 50 Md.App. at 443, 439 A.2d 26. This is no longer the test. Instead, the Court of Appeals has now held that the relocation itself is a sufficient "change in circumstances" to trigger a trial judge's full evaluation of the future best interests of the child, weighing in the balance the move and any other relevant circumstances. Thus, the issue is no longer who has the burden of proving the specific harm flowing from the move. Instead, each litigant has the burden of establishing that he or she is a fit and proper person to parent. Each bears the burden of persuading the trial judge that he or she is best suited to serve as the primary custodian. The trial judge's role is not so much to ferret out specific harm, but to evaluate the child's best interests.

In *McCready*, the Court of Appeals stated that the reason for requiring a change of circumstances is to keep a liti-

gious or disappointed parent from merely bringing up and relitigating an earlier decision in the hopes of finding a court sympathetic to his or her position. *McCready*, 323 Md. at 481, 593 A.2d 1128. The Court of Appeals said:

> "[T]he question of 'changed circumstances' may infrequently be a threshold question, but is more often involved in the 'best interest' determination, where the question of stability is but a factor, albeit an important factor, to be considered."

*McCready*, 323 Md. at 482, 593 A.2d 1128. Once a sufficient change in circumstances has been established—and relocation can be that change—the threshold question has been reached. The question then becomes: whether, based on all the evidence, a change of custody will best accommodate the best interests of the child. *McCready*, 323 Md. at 483, 593 A.2d 1128.

In *Domingues*, 323 Md. at 500, 593 A.2d 1133, the Court of Appeals said:

> "A change in circumstances which, when weighed together with all other relevant facts, requires a court to revise its view of what is in the future best interest of a child, is a sufficient change. It is neither necessary nor desirable to wait until the child is actually harmed to make a change which the evidence shows is required. Clearly, change is not to be lightly made. The benefit to a child of a stable custody situation is substantial, and must be carefully weighed against other perceived needs for change."

Thus, where the custodial parent seeks to relocate, the focus of the trial judge's inquiry has shifted, from a narrow "specific harm" analysis, to a more sweeping "best interests of the child" inquiry. Stability, in the form of continuing primary physical custody in the same parent, is now only a factor, albeit a substantial factor.

When we use the word "change" in connection with a relocation by the parent with primary physical custody, change is an essential issue, because change there will be. In the case now before us, no matter what the ultimate

outcome, the children will suffer a change. They will be leaving their home in Baltimore County, either for a totally new environment in Texas, or a partially new environment in their father's home. In addition, there could be a change in the parent with primary physical custody. Such a change would result in a substantial loss of contact between the boys and their young half-sister. One change is inescapable: the ease of access the children now have to both parents and both stepparents will be gone.

## THIS CASE

■ The trial judge in this case took a sensitive, careful approach to all the issues and we do not fault one step he took. He did the best he could to ameliorate the changes and the pain that was bound to flow to all concerned.

The trial judge took testimony from Mr. Goldmeier and his witnesses. At the end of Mr. Goldmeier's case, Ms. Lepselter moved for judgment based on *Jordan* and the right of the physical custodial parent to relocate. The judge indicated that he felt the agreement to reopen custody in the event of a move from Baltimore County distinguished this case from *Jordan.* Hence, the court heard testimony from both sides and concluded:

> "These kids have two great parents from what I can figure out, two great stepparents, Mr. Lepselter has a business opportunity now in Dallas and I find nothing sinister in the way the Lepselters have gone about making their plans to move to that area."[2]

The trial judge's comments on all the various issues were made in a positive manner. He found nothing negative about the prospective move. He was unable to find anything negative in the relationship between Mr. Goldmeier

---

**2.** Mr. Lepselter testified that he was concerned that his employer in Baltimore would experience a down-turn in the Baltimore market due to declining demand. The trial judge apparently concluded that the Lepselters' decision to move to Texas was motivated by economic considerations and that they had no other ulterior motives. We see no basis to hold this finding clearly erroneous.

and his sons, Mrs. Lepselter and her sons, or in the relationship between the stepparents and the boys.

The move in this case was to take place in February, 1990 and the trial judge expressed concern about moving the boys within the school term. He concluded it would be in their best interests to finish school and postponed the final decision until summer. He opined that, were Ms. Lepselter to remain in Baltimore County for the time being, the boys could remain with her. That was February 23. On March 2, at a further hearing, the trial judge enjoined Ms. Lepselter from removing the children from Baltimore County to Dallas, Texas, without permission and announced he would appoint counsel to represent the children, and make a recommendation. As reduced to writing and signed on March 6, this order added the requirement that the Support and Custody Division file a report on an expedited basis.

In March of 1990, we entered our order in *Johnson*. Ms. Lepselter then sought a rehearing, contending that the relocation did not warrant a change of custody. The trial judge reserved judgment, however, and waited for the report of appointed counsel and the Support Division. Mr. Dantes, appointed counsel for the two boys, filed a full, detailed and articulate report with due regard to the sensitive nature of his task. He recommended:

"1.  Physical custody remain with Ms. Beth M. Lepselter;

"2.  Liberal visitation be continued to be offered to Mr. Edward Goldmeier; and

"3.  [The Circuit Court for Baltimore County] retain jurisdiction over the matter allowing [his] clients to revise the physical custody issue at a future date if either or both Joshua or Daniel Goldmeier subsequently concludes that a change of physical custody is desirable."

The depth of Mr. Dantes's insights into the issues is illustrated by a particularly poignant passage: "My clients both want frequent visits with their father. Daniel's first comment on the subject was that 'It'll be the same.' Joshua

then said, 'Daniel, it won't be the same, round trip air fare is $338.00.' " Joshua, of course, was correct.

At the hearing on May 31, 1990, the primary discussion surrounded visitation and the court delivered a statement which requires us to remand. We are quick to say this was not a mistake by the trial judge, but results from the trial judge following the law as he understood it to be and as it then was. The trial judge said:

"Well, I have heard testimony, I have examined the reports, I have appointed counsel, and I have considered Mr. Dantes['s] report. I must apply the law set forth by the Court of Special Appeals in a decision that had not been handed down when we first came into this courtroom in connection with this case, and while I recognize that the Court of Appeals has granted certiorari and may well change the current law in this area, the Court of Special Appeals published opinion in *Johnson versus Domingues* requires, in my judgment on the basis of the evidence that has been presented, that I deny Mr. Goldmeier's petition for change in custody. That denial leaves the parties essentially where they were before the petition. There is joint custody with primary physical custody to Mrs. Lepselter and that means that the children are not restricted to residing in the Baltimore metropolitan area and that the injunction in a change in their residence to the State of Texas is hereby dissolved.

"Now, the ruling means that the children can move to Texas, but the ruling also means that Mr. Goldmeier is entitled to liberal visitation."

He went on to say:

"I have come to respect the parents and the present spouses of the parents who are involved in this. Apparently these are wonderful children who are being raised right and all of you are to be commended for what you have done for the children."

Fortunately, in the instant case, the parties are financially able to at least maintain more than a token relationship

for the boys with their father. The parents have agreed to share the costs of transportation to Baltimore County and back to Texas, and have agreed to attempt to send the children to Baltimore County the night before visitation if it can be done without harm to school commitments. The parties have also agreed that such travel the night before must be accomplished by 10:00 p.m.

We must add that the testimony in this case with respect to the actions of the parents, the reactions and concerns of the stepparents, the concern for the grandparents, the attitude and condition of the children, the advantages for the children, the schools in both locations, the living arrangements, and all the other factors involved in establishing what is in the best interests of the children, would support the ultimate decision made by the trial judge. It would also support a contrary decision. The evidence is such that we cannot say that the trial judge would have been clearly erroneous either in deciding as he did or in deciding that the boys should remain in Baltimore County with their father with equal liberal visitation for Ms. Lepselter. This gratuitous comment by us will not ease the loss to either parent or the children, but it hopefully will shorten the time before Joshua's desire, as expressed to Mr. Dantes, will be realized; namely, that "the decision be made and get out from under the pressure of choosing."

In summary, since entry of the order of October 22, 1990, the Court of Appeals has made the trial judge's reliance on our *Johnson v. Domingues* opinion inappropriate. The decision must be based on what is in the best interests of the children, even if some prognosticating is an essential element of that decision. The reversal of *Johnson* requires us to remand the case now before us to permit the trial judge to undertake the difficult weighing process that is his responsibility.

CASE REMANDED FOR FURTHER PROCEEDINGS WITHOUT AFFIRMANCE OR REVERSAL. COSTS TO ABIDE THE RESULTS.