603 A.2d 915

**Clayton HADICK**

v.

**Susan HADICK.**

No. 640, Sept. Term, 1991.

Court of Special Appeals of Maryland.

April 2, 1992.

---

Floyd Willis III, Rockville, for appellant.

Alan D. Massengill, Gaithersburg, for appellee.

Argued before ALPERT, CATHELL and DAVIS, JJ.

CATHELL, Judge.

Appellant, Clayton Hadick, seeks review of a custody decision from the Circuit Court for Montgomery County. On February 14, 1990, Appellant filed suit for a divorce *vinculo matrimonii* against Appellee, Susan P. Hadick, and for custody of their three minor children: Aaron, age 15; Micah, age 12; and Leah, age 10. Appellee answered and subsequently filed a counter suit for divorce.

On April 10, 1990, an order was issued referring the matter of custody to a Domestic Relations Master for a hearing. Thereafter, an order was entered appointing Mr. Mininsohn as counsel to represent the minor children regarding the issue of consent to release medical records.[1] On June 15, 1990, a second order was entered appointing Mr. Mininsohn to represent the children in all matters arising out of the custody dispute.

In July, at a hearing as to custody, the master issued an oral opinion recommending that custody of Aaron and Micah be given to Appellee and Appellant receive custody of Leah. She subsequently issued her Report and Recommendation in accordance with that oral opinion.

Appellant filed exceptions to the Report and Appellee filed a response to those exceptions. On December 19, 1990, a hearing on the exceptions was held in which the trial judge issued a decision accepting without modification the

---

1. This appointment was made pursuant to the holding in *Nagle v. Hooks,* 296 Md. 123, 125–28, 460 A.2d 49 (1983) (based upon Md.Code Ann., Cts. & Jud.Proc. § 9–109(c) (1989)). *See also Levitt v. Levitt,* 79 Md.App. 394, 403 n. 6, 556 A.2d 1162 (1989). Leah has cerebral palsy and is quadriplegic, but can use her right side much more than her left side. She is also mildly retarded. She, however, can feed herself somewhat. She is non-ambulatory and must be carried or transported by wheelchair to any location. She weighs approximately 35–40 pounds. In the past, she had been subject to crying spells, but the frequency and duration of the spells have decreased in recent years. Her life expectancy is normal.

Another child has been diagnosed by Appellee's psychiatrist as having a "conduct disorder." He has been involved in incidents of inappropriate behavior. The master, as part of her recommendations, advised that he continue counseling.

Report and Recommendations of the master. Appellant timely noted this appeal.

The issues raised in this appeal are:

I. Whether the Chancellor was clearly erroneous and abused his discretion in accepting the Report and Recommendations of the Master which contained findings of fact which were without basis in the record and which were inadequate to support the ultimate findings.

II. Whether the Chancellor erred as a matter of law in dividing custody of the siblings without a compelling reason when such a decision is contrary to Maryland precedent.

III. Whether the Chancellor abused his discretion in awarding custody of Aaron and Micah to Appellee when such a placement is not in the best interests of all the children.

IV. Whether the Report of the children's attorney was based on improper information and an inadequate foundation.

We remand the case to the trial court for appropriate findings consistent with the standards stated by the Court of Appeals in *Domingues v. Johnson,* 323 Md. 486, 593 A.2d 1133 (1991). That Court stated:

> We hold, however, that the chancellor incorrectly accepted the recommendations of the master upon a finding that those recommendations were not clearly erroneous, instead of subjecting the master's fact-finding to a clearly erroneous test and then exercising his independent judgment concerning the proper conclusion to be reached upon those facts.

> \*     \*     \*     \*     \*     \*

> The conclusions and judgments of the master to which the chancellor referred are those that must be made by the chancellor, upon his independent review of the record and of the facts properly found by the master. The ultimate conclusions and recommendations of the master are not simply to be tested against the clearly erroneous

standard, and if found to be supported by evidence of record, automatically accepted. That the conclusions and recommendations of the master are well supported by the evidence is not dispositive if the independent exercise of judgment by the chancellor on those issues would produce a different result.

323 Md. at 490–92, 593 A.2d 1133.

■ The trial judge's actions in the case *sub judice,* with respect to the master's findings, do not comport with the requirements of *Domingues.*[2] The trial judge, in rendering his decision stated:

The record in this case, in the Court's view, supports the resolution of the question that has already been made by the master.

It is supported by the record. I don't find it is an abuse of discretion. I don't find that it is inappropriate. I also find that it is consistent with what would be in both the short term and long term interests of all of the children of the parties, and therefore the Court is not going to modify the master's finding and it shall not be disturbed.

As we perceive the language of the chancellor, he is accepting the recommendations of the master and is refusing to "modify" or "disturb" them. *Domingues* requires an independent exercise of judgment resulting in the trial court's own fact-based conclusions. The Court in *Domingues* stated: "Because the opinion of the chancellor ... suggests that he accepted the master's recommendations ... upon a finding that they were not clearly erroneous but were 'well supported by the evidence,' rather than exercising his independent judgment on those issues, the case must be remanded...." 323 Md. at 493, 593 A.2d 1133. The Court subsequently discussed the appropriate method to be used by chancellors to address issues coming from a master's hearing and recommendations, saying:

---

**2.** The court below did not have the benefit of *Domingues* at the time it rendered its decision.

The chancellor must carefully consider the mother's allegations ... and decide *each* such question. The *chancellor* should, in an oral or written opinion, state how *he* resolved those challenges.... [T]he chancellor must then exercise independent judgment to determine the proper result.

As we have attempted to make *painfully* clear, the burden cast upon a chancellor in a case of this kind is substantial.

*Id.* at 496–97, 593 A.2d 1133 (emphasis added).

In remanding, we are cognizant of, and direct the chancellor's attention to, the *Domingues* Court's overview of the feasibility of utilizing masters in contested custody cases.

Although we are remanding, we shall, nevertheless, opine on certain issues raised in this extremely difficult case that have caused us some concern so that they may be more appropriately addressed upon remand. *See* Md.Rule 8–131(a); *Montgomery County v. Maryland Soft Drink Ass'n, Inc.*, 281 Md. 116, 122–23, 377 A.2d 486 (1977); *County Comm'rs of Queen Anne's County v. Miles*, 246 Md. 355, 373, 228 A.2d 450 (1967); *Montgomery County Bd. of Ed. ex rel. Carrier Corp. v. Glassman Constr. Co.*, 245 Md. 192, 198, 225 A.2d 448 (1967).

We acknowledge that the sensitive matters and the unique factual setting of this custody controversy creates for the master, the chancellor, and this Court, an excruciatingly difficult situation when we, in our respective roles, attempt to resolve this dispute without causing an injustice. It may well be that no matter what the ultimate decision, an injustice to at least one of the parties will occur. All of us are forced to determine, as best we can, again given our respective roles, what is in the best interests of the children, knowing that the decision may well be both just and unjust.

The master, in making her recommendations concerning custody of the children, among other reasons, stated:

Sometimes the reason that it is better for the kids not to be together is that there is only a finite amount of

attention that a parent has to pay and if you have one child or two children or three children who need a lot more attention than the normal, average kid needs, if there is such a thing, then when you don't have two parents together to shower the attention on the kids, you have to look at whether you think one child—one parent is going to be able to do it all.

Mrs. Hadick found out that given these three children she couldn't do it all and my most serious question about how good a parent Dr. Hadick is comes from why he didn't recognize what an enormous responsibility those three kids were....

\* \* \* \* \* \*

But, on the other hand—and this is back to this question of how much attention is there available, how much strength does a parent have—Dr. Hadick[3] said in his deposition, but he said clearly here that he has made a real commitment to take care of Leah as long as he possibly can.

I have a real concern that for the boys there just wouldn't be nearly enough left if his commitment to Leah is that great and I am not suggesting that that is an inappropriate kind of commitment to make....

That is his decision, but once he has made that decision, it is my obligation in looking at the best interests of all three kids to see whether that commitment to Leah leaves it in the best interests of Aaron and Micah to reside in that one family unit and my conclusion is that it would not.

The master stated, and the chancellor accepted, that both parents were "fit" to care for the children. There was evidence establishing that both parents would be "fit" to care for the children. Dr. Hadick is committed to taking care of Leah, participates in various athletic events with his sons, and helps the boys with their school work. He has

---

**3.** Dr. Hadick is a Veterinarian.

arranged for his mother to come and live with him if he gets custody of the children. Further, Appellant works only a mile from his home in Ohio. Although the evidence indicates that the boys get along well with Dr. Hadick's mother, there is also some evidence that they do not. Appellee has maintained a good deal of contact with Aaron's principal and intends on enrolling Micah in the same school so that they can be together and make the same friends. She lives in a nice residential area and she works within 20 minutes of the home, which will make her accessible to the children. We perceive no error or abuse in the chancellor's finding that both parents are fit. *See Ross v. Hoffman*, 280 Md. 172, 187, 372 A.2d 582 (1977); *Davis v. Davis*, 280 Md. 119, 125, 372 A.2d 231 (1977); *McAndrew v. McAndrew*, 39 Md.App. 1, 9, 382 A.2d 1081 (1978).

We have stated that "[t]here can be no tie-breaker in a custody case because ... there should never be a tie. The determination of custody is an area in which discretion is vested in a judge...." *McAndrew*, 39 Md.App. at 9, 382 A.2d 1081 (citation omitted). Therefore, where, as here, both parents are found to be "fit", the trial judge has the discretion to decide which parent will receive custody.

The Court of Appeals has stated that:

The evidence in a given case may be sufficient to support an award of custody to either parent. Notwithstanding the oft-repeated reference in the cases to "fit" and "unfit" parents, it is quite often the case that both parents are entirely "fit" to have legal and/or physical custody of a child, but joint custody is not feasible. In such cases, the chancellor must exercise his or her independent discretion to make the decision. This does not mean that the chancellor must disregard the recommendations of the master. Consideration may and should be given to those recommendations, but in the final analysis, the decision must be made by the chancellor.

*Domingues*, 323 Md. at 492, 593 A.2d 1133.

It is also a paramount principle of child custody that the best interest and welfare of the child is of primary

consideration. *McCready v. McCready*, 323 Md. 476, 481, 593 A.2d 1128 (1991); *Queen v. Queen*, 308 Md. 574, 587, 521 A.2d 320 (1987); *Ross v. Hoffman*, 280 Md. 172, 175, 372 A.2d 582 (1977); *Wallis v. Wallis*, 235 Md. 33, 36, 200 A.2d 164 (1964); *Glick v. Glick*, 232 Md. 244, 248, 192 A.2d 791 (1963); *Hild v. Hild*, 221 Md. 349, 359, 157 A.2d 442 (1960); *Cullotta v. Cullotta*, 193 Md. 374, 384, 66 A.2d 919 (1949); *Kartman v. Kartman*, 163 Md. 19, 23, 161 A. 269 (1932); *Monroe v. Monroe*, 88 Md.App. 132, 140, 594 A.2d 577 (1991); *Shunk v. Walker*, 87 Md.App. 389, 396, 589 A.2d 1303 (1991); *Newkirk v. Newkirk*, 73 Md.App. 588, 592, 535 A.2d 947 (1988); *Vernon v. Vernon*, 30 Md.App. 564, 566, 354 A.2d 222 *cert. denied*, 278 Md. 737 (1976). But, "[o]rdinarily, the best interests and welfare of the children of the same parents are best served by keeping them together to grow up as brothers and sisters under the same roof." *Hild*, 221 Md. at 359, 157 A.2d 442 (citations omitted). Generally, Maryland law frowns upon the division of siblings. *See Melton v. Connolly*, 219 Md. 184, 148 A.2d 387 (1959) (in most cases, a child should be raised with his or her brothers and sisters); *Roussey v. Roussey*, 210 Md. 261, 123 A.2d 354 (1956) (divided control is to be avoided); *Dunnigan v. Dunnigan*, 182 Md. 47, 31 A.2d 634 (1943) (well being of children would best be served by keeping them together as brothers and sisters). *But see Davis v. Davis*, 280 Md. 119, 372 A.2d 231, *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh'g denied*, 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978) (upheld division of custody where youngest child had resided for two years with the mother without her siblings and had adjusted well to that arrangement); *Bryce v. Bryce*, 229 Md. 16, 181 A.2d 455 (1962) (upheld division of custody where one parent was suffering from a mental disease that may have had a detrimental effect on a 4–year–old, but the two older children remained with the sick parent because they had already formed their personalities and would not likely be affected); *Jordan v. Jordan*, 50 Md.App. 437, 439 A.2d 26 *cert. denied*, 293 Md. 332 (1982) (upheld separation

where the agreement of the parents divided custody of brothers for a period of more than two years and the separation caused neither to suffer from physical, mental or emotional adverse effects).

In the case *sub judice*, relying in part on our decision in *Kennedy v. Kennedy*, 55 Md.App. 299, 462 A.2d 1208 (1983), and to a certain extent on the facts of this case and certain unsupported or poorly supported inferences, the master, and, consequently, the chancellor, divided the custody of the siblings between the parents, giving Mrs. Hadick custody of Aaron and Micah and Dr. Hadick custody of Leah.[4] Unlike the situation in *Kennedy*, the children in the case at bar expressed no preference to be with one parent rather than the other. On the contrary, they chose not to tell the master.

The master, in recommending the division of custody, placed great significance on the fact that Leah is handicapped and needs special attention. The master inferred that because Appellant was devoted to taking care of his daughter that he would not be sufficiently committed to taking care of Aaron and Micah as well. This, according to the master, would not only be harmful to them but it also was not in their best interests.

■ We first note that there was little evidence that Appellant's commitment towards the boys was in any way diminished because of his commitment to Leah. Generally, as we see it, a willingness and ability to fulfill the responsibilities of parenting a handicapped child does not justify an inference of a lack of present or future commitment to other children. To put a parent in the position where this commitment alone operates to deprive him of the right to have custody of the remaining children might very well reduce the frequency of such commitments to handicapped children. That would not be in the best interest of those

---

4. The parties agreed that Leah would live with Appellant.

children.[5]  Likewise, it can operate to the detriment of the remaining children who would be deprived of a normal relationship with an otherwise fit parent, and of a normal relationship with the sibling.  That, in our view, might not be in the best interest of the other children.

We acknowledge, however, in a given circumstance, and perhaps in the present case, that when there is evidence that a commitment to a handicapped child is having an adverse impact or probative evidence that it *will* have an adverse impact in the future, then it would be proper to consider it, along with the other available evidence on that point.  On the other hand, in the absence of evidence that such a commitment to one child operates against the best

---

**5.** The historical annotations in 29 U.S.C.S., section 701 (Law.Co-op.1990), "Rehabilitation Services Administration," contain a congressional finding that:  "[T]he primary responsibility for meeting the challenge and problems of individuals with handicaps has often fallen on the individual or his family...."  This finding led to the creation of the White House Conference on Handicapped Individuals Act which was directed to "give special consideration to recommendations for:  ... enabling individuals with handicaps to have [means] sufficient ... for participation in family and community life ... [and] resolving the special problems of individuals with handicaps who are homebound...."

The General Assembly of Maryland has declared that it is the legislative policy of this State:  "(1) [t]o promote, protect, and preserve the human dignity ... and general welfare of individuals with developmental disability ... (9) [t]o protect the rights of parents and to help parents ... in planning for and assisting those individuals with developmental disability who are unable to manage their own affairs...."  Md.Code Ann., Health–Gen. § 7–102 (1990).  Additionally, the Legislature has declared that "it is the policy of this State to enhance the quality of life for children with developmental disability and their families, *to preserve family unity,* and to promote family stability...."  Md.Code Ann., Health–Gen. § 7–702(b) (emphasis added).

The recommendation of the master in the case at bar, subsequently adopted by the trial court, *i.e.,* that a parent's commitment to a handicapped or disabled child can be grounds for denying that parent custody of other children, does not further the State's policy which is aimed at preserving family unity and promoting family stability.  Under the circumstances of this case, a parent might be penalized solely for making that commitment in the absence of any significant evidence of present or future adverse impact on the best interest of the other children.

interest of the other children, it is, as we see it, improper to infer an adverse result. Even when some actual evidence exists, the trier of fact must still weigh that evidence in light of the generally stated preference for keeping siblings together. That is not to say that that preference is inviolate but only that it must receive its due consideration.

We are unable to determine from the language of the master's proposed recommendations given at the conclusion of the hearing on July 26, 1990, her "Report and Recommendation" dated September 7, 1990, and the chancellor's order accepting the master's recommendations, whether the master's recommendations and the trial court's acceptance were sufficiently based on factors other than the unsupported inferences made by the master as to the effect of Dr. Hadick's commitment to Leah. We have included portions of those rulings, *supra*. We cite additional portions by way of further example.

The master at the hearing on July 26, 1990, opined:

This is an unusual case in which there are two parents who are obviously fit....

\* \* \* \* \* \*

[W]hen I was talking to Aaron and I asked him something about Leah, his whole face lit up. There is clearly great love there. I saw Leah with the boys and it is equally clear that she enjoys that....

I am really concerned ... about the emotional well-being of the boys. I think that Aaron has ... serious problems....

\* \* \* \* \* \*

I am also extremely concerned about Micah. [H]e has pretty much kept it cooped up.

Happy campers aren't always happy kids....

\* \* \* \* \* \*

I mean, this kid is in danger of disappearing....

I suggest to you both as parents that you should pay attention to Micah.

\*   \*   \*   \*   \*   \*

What is really unfortunate, I think, is ... that the geographical separation is going to be so great. Were that not true, it would be a different case and dealt with, I think, much more easily....

She then concluded that division of custody would be her recommendation but later ascribed additional reasons. They included:

I think it is fair to say that that [preference to keep siblings together] really is where you start in any case....

I think there is probably a special reason to do something else more often than we think....

\*   \*   \*   \*   \*   \*

[I]t is my obligation ... to see whether that commitment to Leah leaves it in the best interest of Aaron and Micah to reside in that one family unit and my conclusion is that it would not.

In her written report to the chancellor, the master's conclusions and opinions included:

It is always a difficult decision to recommend that siblings be separated.... But in this case, more than in most, the best interests of the children must be examined separately. It would not be adequate to say that because the defendant acknowledges her increasing difficulty with the physical requirements of care for Leah, ... that the boys' custody should also be granted to the plaintiff because it is in the best interest for all three children to be together. While it may be in Leah's best interest to have the boys with her ... it does not seem that it is in the best interests for ... boys to always have a sibling come first, especially when that sibling's needs are so

great that when they are met there is not much left for them.[6]

> They [the boys] love Leah and do not wish to sever their relationship with her. But Leah is not where "home" is. Given the time, the attention and the needs of Leah, as well as the demands of career, Aaron and Micah will have much more attention ... and more parental energy and time to meet their needs if they remain with the defendant.

While the record reflects that the chancellor extensively reviewed the file, in the rendering of his decision he did not separately address and resolve the issues raised by the exceptions but accepted, without sufficient independent findings, the report of the master.

There was other substantial evidence of the parties' situations which may, or may not, support the recommendations and order separating the custody of the children and awarding the custody of the boys to their mother. That evidence included the move to Ohio, itself, and the fact that the Ohio home would be on a military base. There were facts presented that living on such an installation would have both positive and negative effects upon the children. There was evidence that the boys' current school environment in Maryland is meeting with a favorable response from both boys. As we have said, there was evidence that the boys' relationship with their paternal grandmother was both positive and negative. The grandmother was not in good health and the symptoms of her health problems (coughing, expectorating, etc.) had caused one or more of the boys distress. There was also evidence as to the varying methods used by the respective parents in the disciplining of the boys.

Nevertheless, we are unable to say that the master's recommendation as to custody would have been the same had she not relied in substantial part on inferences she

---

**6.** As we have stated elsewhere in our opinion, there is evidence that *both* parents actively participated in the boys' activities, as well as looking after Leah.

made without factual support as to an adverse impact on the boys from the father's commitment to Leah. Such an adverse effect may well be a result, but from our review of the record we have found no *evidence* that it is a current result or will be a future result. It may well be that sharing with, helping, and accepting the difficulties with which the handicapped cope, might help to create and strengthen in Aaron and Micah, favorable character traits, *i.e.*, sensitivity, caring, loving, and understanding. Without probative evidence of the effects of such a relationship, it is difficult, as we see it, to determine whether the net effect would be negative or positive. While an inference can be made that separation from Leah might be easier for the boys, ease alone is not necessarily always in the best interests of children.

In the case *sub judice*, the master appeared to have based her recommendations on custody primarily on the inference she made that the father's commitment to the handicapped child would cause him to have insufficient parenting resources to devote to the other children. We fail to find sufficient factual basis for that inference. These children apparently resided together all of their lives and remained together prior to the custody hearing in July. They are accustomed to the daily companionship and contact that accompanies living in a family. Little medical or psychological evidence was introduced that the boys presently suffer severely from living with Leah or resented her in any significant way. On the contrary, the evidence shows and the master stated that "both boys genuinely, unselfishly have a love with positive feelings about and for Leah.... I saw Leah with the boys and it is equally clear that she enjoys that...." There was also some testimony that the boys did not seem to be disadvantaged from being in Leah's presence. Further, evidence was presented that the boys have become patient and understanding of handicapped people. There was some evidence to the contrary. In the past Leah's vocalization had been an irritating factor to one or more of her brothers. On occasion, the brother's re-

sponses to her were perfunctory and abrupt. There, of course, was evidence that Leah's needs had in the past generated responsibilities, duties and demands not only upon the parents but upon the boys as well.

We hold that absent probative evidence of adverse impact, or probative evidence of the probability of some adverse impact, an inference should not be made that a parent's commitment to a handicapped child is detrimental to that parent's other children. In addition to remanding based upon *Domingues,* we remand so that recommendations and orders unaffected by the improper inferences can be made.

JUDGMENT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.