748 A.2d 493

**Theresa H. VIAMONTE**

v.

**Christopher J. VIAMONTE.**

**No. 1232, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 10, 2000.

Connie L. Kratovil, Crofton, for appellant.

No brief or appearance by appellee's counsel.

Argued before SALMON, THIEME and THEODORE G. BLOOM (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

This is an appeal of a judgment of the Circuit Court for Prince George's County in a dispute over custody of the parties' five-year-old son, Alexander J. Viamonte. Following a trial in February 1999 and an in-chambers interview of the child and his half-brother, Daniel Hixon, the court found both parties to be fit and proper custodians of the child, awarded joint legal custody, and granted primary physical custody to appellee, the child's father. The court's decision results in the separation of two half-siblings, and appellant, the child's mother, now presents the following questions:

1. Did the trial court abuse its discretion by placing the child in appellee's physical custody when it made no finding of exceptional circumstances or actual harm that would warrant separating half-siblings?

2. Did the trial court abuse its discretion by placing the child in appellee's physical custody when it made no specific findings on the issue of separating half-siblings?

We answer "no" to these questions, and we explain.

## Facts

Theresa Hixon and Christopher Viamonte were married on March 19, 1994, and Alexander, their one child, was born on August 13 of the same year. Appellant had sole custody of Daniel Hixon, a child from a prior marriage, who was six years of age at the time the parties were married. The parties and the two children lived together at their residence in Laurel.

Prior to the marriage, each party was employed; appellant was a title abstractor and appellee was a police officer with the Metropolitan Police Department in the District of Columbia. Appellee was not, however, on active duty, because of a back injury. Subsequently, he was placed on full disability and retired from the force in August 1996.

Shortly after the marriage, the parties decided to form a title company named TC Associates. Appellant believed that owning her own business would afford her a more flexible work schedule and allow her to spend more time with the children. At TC, she was in charge of all operations of the business and served as its president, with a 70 percent shareholder interest in the company. Appellee, who was unfamiliar with providing title search and abstracting services, was treasurer and held a 30 percent interest. Testimony showed that appellant did most, if not all, of the substantive work of the company. Appellee did not keep regular hours there, but instead assisted his wife with accounting and administrative work.

In late 1994, TC landed a lucrative contract with Prince George's County. Appellee assisted with drafting the bid proposal and procuring the contract. The terms of the contract dictated that TC would face liability if it could not meet strict deadlines. Once TC entered into the contract, business operations accelerated and appellant had to devote many more hours to the company. On several occasions, appellant testified, she had to work all night to meet a deadline and she was unable to get out of bed in the morning to tend to the children.

In July 1997, appellee suggested that the parties buy a house to use as an office for TC Associates. They purchased a home in Upper Marlboro for that purpose. As the workload continued to increase, appellant worked grueling hours and would occasionally spend the night at the office in order to meet the required deadlines. Several times, appellee brought the children to the office so that the family could dine together.

Although appellant implored appellee to help her with the heavy workload, he was uncooperative and lacked the requisite skills to assist with substantive work. She also asked him about measures to reduce the workload, including taking on fewer clients and dropping the county contract when it came up for renewal. Appellee would not agree, however, and actually renewed the Prince George's County deal without appellant's consent. As a result, because she was unable to fulfill all the obligations herself, appellant subcontracted out part of the county work.

The growth of the business fueled tensions in the marriage and sparked many arguments between the parties. Arguments escalated into physical violence. At one point, after a violent disagreement, appellant went to her office and cried hysterically in front of the tenant who rented space next door.

Appellee testified that he was the primary caretaker of the children during the marriage. He claimed to have fed, clothed and readied the children to attend school each day. He noted that appellant seldom participated in family activities because she was too tired. At times, she slept through the entire weekend, waking only for meals. Appellee believed that appellant was depressed and he testified she saw a physician and began taking Prozac. Some time later, she ceased the doctor visits and failed to resume them.

Appellant testified that, despite appellee's assertions, she was the children's primary caretaker. She explained that the family used day care for the children, even though appellee did not work and was home at the time. In fact, appellee often employed a sitter in the family home, while he was also present there.

The parties separated in October 1997 after a domestic dispute in which the police intervened. Appellee and Alex remained in the Laurel home, and appellant and Danny moved to the home in Upper Marlboro. The parties entered into a consent order for visitation and agreed that Alex would remain with appellee and appellant could exercise reasonable visitation. In addition, the parties agreed that appellant

would continue to run TC Associates and appellee would have no involvement in the business.

Appellant works out of her home and has reduced her workload and client base so that she no longer puts in long hours. In addition, she has hired a full-time employee and several contractors to take up the slack. As a result, she has been able to spend more time with the children. For example, she has involved the children in church activities.

Appellee is now employed by the State of Maryland as an investigator. The job affords him flexibility to care for Alex. He asserts that Alex is a happy, well-adjusted child in his current situation, and that appellant often cut visits short and rarely requested additional time with the child while the temporary consent order for child custody and visitation was in effect.

As for the children's relationship, the testimony shows that they get along well with each other. One witness testified that Danny indicated that "all he wanted for Christmas was Alex." Alex attended Tiny Town daycare in Bowie from June 1998, and he began kindergarten in September 1999.

The current action came about as a result of appellee's amended complaint for limited divorce, custody, and child support. Appellee had filed a domestic violence petition and complaint for custody of the child in October 1997. The parties entered into a consent order controlling custody and visitation during the hearing on the petition, although appellant did not learn of the custody complaint until later. Appellee amended his complaint in March 1998 to include limited divorce, and the parties were unable to agree on custody and support. A trial on these issues was held in February 1999, and the chancellor interviewed both children *in camera* in April. In June, the chancellor issued her opinion ordering joint legal custody and granting primary physical custody to appellee. A timely appeal to this Court was noted on July 29, 1999.

### Discussion

 We uphold the judgment of the chancellor granting primary physical custody to appellee. Maryland Rule 8–131(c) requires that we review actions heard without a jury for clear error,[1] and in *Davis v. Davis,* 280 Md. 119, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), the Court of Appeals applied that rule's predecessor to child custody matters. The clearly erroneous standard is a deferential one, giving great weight to the chancellor's findings of fact. *Id.* at 124, 372 A.2d 231. On matters of law, we apply the harmless error standard. *Id.* at 126, 372 A.2d 231. On the ultimate issue of which party gets custody—the application of law to the facts—we will set aside a judgment only on a clear showing that the chancellor abused his discretion. *Id.* at 125, 372 A.2d 231.

> Such broad discretion is vested in the chancellor because only he sees the witnesses and the parties, hears the testimony, and has the opportunity to speak with the child; he is in a far better position than the appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.

*Id.*

 Such deference is necessary, lest we spend judicial resources second-guessing the chancellor's every decision. Child custody cases are among the most emotionally charged matters to come before the trial court, and this Court has characterized the highly amorphous best interest standard as a "best guess" as to which option is superior for the child. *See, e.g., Montgomery County v. Sanders,* 38 Md.App. 406, 419, 381 A.2d 1154 (1978) ("The fact finder is called upon to

---

1. Rule 8–131(c) states:

 When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future. At the bottom line, what is in the child's best interest equals the fact finder's best guess."). In both *Sanders* and *Shunk v. Walker*, 87 Md.App. 389, 589 A.2d 1303 (1991), this Court listed several factors that must be weighed in making a "best guess" as to custody, including parental fitness; character and reputation of the parties; potentiality of maintaining natural family relations; preferences of the child; material opportunities affecting the future life of the child; age, health, and gender of the child; residences of the parents and opportunity for visitation; length of separation from the natural parents; and prior voluntary abandonment or surrender. Generally, the court will not emphasize any one factor to the exclusion of the others. *Id.* at 397, 589 A.2d 1303 (citing *Sanders*, 38 Md.App. at 419–20, 381 A.2d 1154).

■ Here, the chancellor had to determine whether joint legal custody was appropriate for Alex, then evaluate which parent should have primary physical custody of the child, or if the parents should share physical custody. In examining the first issue, the chancellor relied on *Taylor v. Taylor*, 306 Md. 290, 508 A.2d 964 (1986), which lists factors to be considered for the award of joint legal custody that are much like those listed in *Sanders* and *Shunk*. These considerations include the

i. capacity of the parents to communicate and reach shared decisions affecting the child's welfare;

ii. willingness of the parents to share custody;

iii. fitness of the parents;

iv. relationship established between the child and each parent;

v. preference of the child;

vi. potential disruption of the child's social and school lives;

vii. geographic proximity of the parental homes;

viii. demands of parental employment;

ix. age and number of the children;

x. sincerity of both parents' requests;

xi. financial status of the parties; and

xii. benefit to the parents.

*Id.* at 304–311, 508 A.2d 964. In her memorandum opinion, the chancellor applied evidence adduced to *each* of these considerations and determined that joint legal custody was in the child's best interest.

She next turned to the issue of primary physical custody. Expanding on her analysis for the matter of legal custody, which explicitly included considerations applicable to physical custody, the chancellor stated that she also considered the factors from *Sanders* and *Shunk* and concluded that "*both parents are fit and proper to have custody of the minor children,*" but that appellee's "*personal and occupational situation is more stable and that he is therefore more able to provide for Alex.*"

On these points, we find no abuse of discretion. The chancellor correctly cited Maryland law and examined point-by-point the evidence in light of the considerations in *Taylor*. We find that her memorandum opinion adequately explained how she resolved the ultimate issue and we affirm.

■ Appellant challenges the chancellor's finding on two fronts. She argues that the best interest standard requires that the court find exceptional circumstances or actual harm warranting the separation of half-siblings. She also claims that the court below erred by not making separate findings of fact on the issue of separating half-siblings. There exists a long held presumption under Maryland case law, argues appellant, that raising siblings together is in their best interest. She cites numerous cases, many quite old, holding that divided

control is to be avoided and that siblings must not be deprived of each other's companionship.[2] Appellant even cites a case that pertains to the separation of half-siblings, *Tedesco,* 111 Md.App. at 649, 683 A.2d 1133, to support her point that the chancellor must find that keeping siblings together would adversely affect the child in question in order to overcome the presumption against separating siblings. *See Hadick,* 90 Md. App. at 751, 603 A.2d 915 ("Even when some actual evidence [of adverse impact] exists, the trier of fact must still weigh that evidence in light of the generally stated preference of keeping siblings together. That is not to say that that preference is inviolate but only that it must receive its due consideration."). She also argues that Maryland Rule 2–522(a) required the chancellor to make a separate finding on the merits of separating the two half-siblings.[3] In her view, the chancellor erred because no freestanding findings about separating the children appear in the memorandum opinion.

As she builds her case for keeping Alex and Danny under the same roof, however, appellant carries our precedents to their illogical extreme. In *Tedesco,* for example, we held not that the chancellor had erred by separating half-siblings, but that he had *not erred* by weighing in his considerations the question of whether half-siblings should be kept together. 111

---

**2.** *See, e.g., Sider v. Sider,* 334 Md. 512, 639 A.2d 1076 (1994); *Davis,* 280 Md. at 119, 372 A.2d 231; *Watson v. Dockett,* 229 Md. 63, 181 A.2d 461 (1962); *Bryce v. Bryce,* 229 Md. 16, 181 A.2d 455 (1962); *Hild v. Hild,* 221 Md. 349, 157 A.2d 442 (1960); *Melton v. Connolly,* 219 Md. 184, 148 A.2d 387 (1959); *Roussey v. Roussey,* 210 Md. 261, 123 A.2d 354 (1956); *Miller v. Miller,* 191 Md. 396, 62 A.2d 293 (1948); *Dunnigan v. Dunnigan,* 182 Md. 47, 31 A.2d 634 (1943); *Kartman v. Kartman,* 163 Md. 19, 161 A. 269 (1932); *Tedesco v. Tedesco,* 111 Md.App. 648, 683 A.2d 1133 (1996), *cert. denied,* 344 Md. 568, 688 A.2d 446 (1997); *Adoption/Guardianship No. 2633 in the Cir. Ct. of Washington County,* 101 Md.App. 274, 646 A.2d 1036 (1994), *cert. denied sub nom. Mauk v. Engle,* 516 U.S. 809, 116 S.Ct. 56, 133 L.Ed.2d 20 (1995); *Hadick v. Hadick,* 90 Md.App. 740, 603 A.2d 915, *cert. denied,* 327 Md. 626, 612 A.2d 256 (1992); *Washington County Dep't of Soc. Serv. v. Clark,* 296 Md. 190, 461 A.2d 1077 (1983); *Jordan v. Jordan,* 50 Md.App. 437, 439 A.2d 26, *cert. denied,* 293 Md. 332 (1982).

**3.** Maryland Rule 2–522(a) states: "In a contested court trial, the judge, before or at the time judgment is entered, shall dictate into the record or prepare and file in the action a brief statement of the reasons for the decision and the basis of determining any damages."

Md.App. at 664, 683 A.2d 1133. A sizable mental leap is required to go from the *Tedesco* Court's position to appellant's position, and we will not make that jump. If appellant's position were the law, parents with custody of offspring from earlier marriages would always have an ironclad advantage over parents without other children, notwithstanding all other important considerations listed in *Taylor, Sanders,* and *Shunk.* We will not handcuff chancellors that way. The best interest standard requires that chancellors have broad discretion to choose the superior option for each child who comes before them.

Further, it is clear to us that the chancellor here met the actual requirement articulated by cases like *Hadick,* providing adequate factual support for the inferences she drew that affected her custody decision. In *Hadick,* the chancellor based his decision upon his own inferences, unsupported by facts in the opinion, that the custodial parent's care of a mentally retarded and physically handicapped child would adversely affect his care for the other siblings. We held that in such cases the chancellor should make a factual finding regarding the negative impact of keeping the siblings together, for there he based his custody decision upon his perception that keeping the family intact would harm some of the children. 90 Md.App. at 740, 603 A.2d 915. We did not hold, however, that the trial court must always make an isolated finding on the merits of separating siblings. Instead, we simply required that all inferences upon which the custody decision is based must have factual support in the record.

It is apparent here that the chancellor weighed Alex's relationship with Danny in the balance—Danny is mentioned in the opinion at the appropriate points—and significant evidence was adduced to show that the two boys love each other and get along well. Yet, when she balanced all the factors, the chancellor found that the day-to-day presence of an older brother in Alex's life was less important than continuity in the same pre-school program and a custodial parent with the job flexibility to manage the challenges of raising a five-year-old. *See Jordan,* 50 Md.App. at 451–52, 439 A.2d 26 (upholding for reasons of continuity the continued separation of siblings who had been separated by agreement). Although appellant has

cut her hours to spend more time with her children, she has suffered in the past from stress-related illness, she remains at the helm of her own business with all the attendant responsibilities, *and* she is the custodial parent of another child. The chancellor's decision may seem harsh to a loving mother, but it does not abuse discretion.

■ Likewise, we find that the chancellor's memorandum opinion adequately addresses the requirements of Rule 2–522(a). This rule simply requires the chancellor to explain, at or before the time the judgment is entered, her reasons for making her decision. Appellant specifically cites *Boswell v. Boswell,* 352 Md. 204, 721 A.2d 662 (1998), in which a homosexual father appealed the chancellor's order that his partner be absent from the home when the children visited. The Court of Appeals affirmed a decision of this Court vacating the order under Rule 2–522(a), because the chancellor had "articulated no reasons for the restriction other than the 'inappropriateness' of the relationship, and . . . failed to state on the record how the children might be harmed by exposure to the relationship." *Boswell v. Boswell,* 118 Md.App. 1, 33, 701 A.2d 1153 (1997), *aff'd,* 352 Md. 204, 721 A.2d 662 (1998). Here, we note that the chancellor clearly articulated the rationale behind her custody decision—"that the father's personal and occupational situation is more stable and that he is therefore more able to provide for Alex"—after she had taken ten pages to lay a factual predicate for this inference. We find no abuse of discretion, and we affirm.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**