593 A.2d 1133

**E. John DOMINGUES**

v.

**Diane L. JOHNSON.**

**No. 10, Sept. Term, 1990.**

Court of Appeals of Maryland.

Aug. 21, 1991.

Glenn M. Cooper (Hope B. Eastman, Paley, Rothman, Goldstein, Rosenberg & Cooper, all on brief), Bethesda, for petitioner.

Stephen E. Moss (Scott M. Strickler, Nancy A. Sachitano, Moss, Strickler & Weaver, P.A., all on brief), Bethesda, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ.

McAULIFFE, Judge.

E. John Domingues and Diane L. Johnson were married on 25 June 1982. Two children were born of the marriage, Kathryn on 8 December 1982 and Matthew on 5 February 1984. The parties separated on 14 May 1985, and by a separation agreement and addendum agreed that they

would "have joint custody of their minor children," and that the children would reside primarily with the mother but be with the father from Tuesday evening until Wednesday evening each week, and from Friday evening until Sunday evening on alternate weekends. The parties were divorced in the Circuit Court for Montgomery County on 23 December 1986, and the provisions of the amended separation agreement were incorporated into the decree.

On 26 February 1988, the mother married a military officer. At the time she decided to marry him, she knew he was scheduled to be transferred from this area for a two-year tour of duty elsewhere. On 11 March 1988, she filed a petition for modification of the existing decree to 1) modify the father's visitation schedule to accommodate her projected move with her new husband to San Antonio, Texas and, 2) increase the father's obligation for payment of child support. The father answered, and filed a motion seeking sole custody of the children.

An extensive hearing, requiring five hearing days and producing 1300 pages of transcript, was held before a domestic relations master. The master filed an 84–page report, finding there had been a substantial change of circumstances since the entry of the divorce decree, and recommending that primary custody be given to the father. The mother filed exceptions, which were heard by Judge Calvin R. Sanders. The chancellor was provided with the transcript of the proceedings before the master, but no additional testimony was taken. After hearing the arguments of counsel, the chancellor overruled the exceptions and entered an order implementing the master's recommendations.[1]

The mother appealed and the Court of Special Appeals reversed, holding that the chancellor improperly applied the "best interest of the child" standard, when he should,

---

1. The father was given custody of the children. The mother was permitted to have the children with her each summer, and during Christmas and spring school vacations.

instead, have determined whether there was sufficient evidence of a change in circumstances affecting the welfare of the children. *Johnson v. Domingues*, 82 Md.App. 128, 570 A.2d 369 (1990). The intermediate appellate court further held that the record failed to show a demonstrable adverse effect upon the children to the date of the hearing, and therefore, as a matter of law, the chancellor should have granted custody to the mother. We ordered a stay of that court's mandate, and thereafter granted the father's petition for certiorari. We now reverse.

We do not agree that the chancellor erred when he considered the best interest of the children. Nor do we agree that the evidence compels but a single result. We hold, however, that the chancellor incorrectly accepted the recommendations of the master upon a finding that those recommendations were not clearly erroneous, instead of subjecting the master's fact-finding to a clearly erroneous test and then exercising his independent judgment concerning the proper conclusion to be reached upon those facts. Because the case ultimately must be remanded to the chancellor for further proceedings, we shall in the course of this opinion discuss in greater detail the function of the chancellor vis-a-vis the master, and the legal principles applicable to this case.

In his opinion, the chancellor recited that the master had found changes in circumstances, including: 1) the remarriage of the mother and her removal with the children to San Antonio, Texas; 2) interference by the mother's new husband with the relationship between the father and his children; 3) the failure of the mother to communicate with the father with respect to the children; and, 4) the failure of the mother to encourage an appropriate relationship between the father and his children. The chancellor further found that the evidence supported the conclusions of the master that "neither of the parties to this action has exhibited that maturity of conduct necessary to enable them to share custodial responsibility with respect to their children," and that the actions of the mother and her new

husband demonstrated "active interference with the [father's] efforts to communicate with his children," and "represented a concerted effort to alienate the children from their father." The chancellor then stated:

The Master also concluded that it would be to the benefit of the children to return them to Montgomery County in their father's custody, since this County had been their home prior to their mother's move to Texas, and since their grandparents, aunts and uncles on both sides of the family reside here. Also considered by the Master was evidence of drug dependency on the part of the [mother's] husband, notwithstanding his successful completion of a rehabilitation program.

Having considered all of the testimony at the hearings, the Master concluded that a continuation of the present joint custodial arrangement is impractical, due primarily to the actions of the [mother] and her husband. Having so found, and weighing the respective advantages and disadvantages of placing sole custody with [mother] or [father], she concluded that the best interests of the children would better be served by the granting of sole custody to their father, with liberal visitation provided to [mother]. These conclusions by the Master are well supported by the evidence.

In making her determinations the Master properly concluded that the proposed change in custody is justified by either the "best interests of the children" test or the "change in circumstances" test. The appropriate test for such a modification is a combination of both.

■ The conclusions and judgments of the master to which the chancellor referred are those that must be made by the chancellor, upon his independent review of the record and of the facts properly found by the master. The ultimate conclusions and recommendations of the master are not simply to be tested against the clearly erroneous standard, and if found to be supported by evidence of record, automatically accepted. That the conclusions and recommendations of the master are well supported by the evi-

dence is not dispositive if the independent exercise of judgment by the chancellor on those issues would produce a different result.

The evidence in a given case may be sufficient to support an award of custody to either parent. Notwithstanding the oft-repeated reference in the cases to "fit" and "unfit" parents, it is quite often the case that both parents are entirely "fit" to have legal and/or physical custody of a child, but joint custody is not feasible. In such cases, the chancellor must exercise his or her independent discretion to make the decision. This does not mean that the chancellor must disregard the recommendations of the master. Consideration may and should be given to those recommendations, but in the final analysis, the decision must be made by the chancellor.

> Litigants in a child custody proceeding, as in all judicial proceedings, are entitled to have their cause determined ultimately by a duly qualified judge of a court of competent jurisdiction.... While the system of resorting to Masters is one of long standing and undoubtedly has salutary effects resulting in the more expeditious dispatch of the judicial process, the system cannot supplant the ultimate role of judges in the judicial process itself. (Citations and footnote omitted.)

*Ellis v. Ellis,* 19 Md.App. 361, 365, 311 A.2d 428 (1973).

■ The chancellor's decision in a contested custody case, frequently among the most difficult a judge is called upon to make, is of critical importance. It significantly impacts upon the lives of the parents and children involved. It is unlikely to be overturned on appeal.[2] And, once that decision has been entered as a judgment, it will ordinarily not be modified except upon a showing of a change in circum-

---

**2.** A chancellor's decision founded upon sound legal principles and based upon factual findings that are not clearly erroneous will not be disturbed in the absence of a showing of a clear abuse of discretion. *Ross v. Hoffman,* 280 Md. 172, 186, 372 A.2d 582 (1977); *Davis v. Davis,* 280 Md. 119, 124–25, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977).

stances justifying a change in custody to accommodate the best interest of the child. *Hardisty v. Salerno,* 255 Md. 436, 439, 258 A.2d 209 (1969).

■ Because the opinion of the chancellor in this case suggests that he accepted the master's recommendations for final disposition upon a finding that they were not clearly erroneous but were "well supported by the evidence," rather than exercising his independent judgment on those issues, the case must be remanded for further consideration. Because the chancellor's order of 22 May 1989 has controlled custody and visitation continuously since its entry, we direct that it continue in effect until vacated, modified, or affirmed by the chancellor after further consideration.

■ Before leaving the subject of the appropriate interaction between the chancellor and master, we comment briefly on the fact-finding process. The Court of Special Appeals concluded that "many of the Masters' findings of fact are second level findings of fact and therefore not entitled to deference." *Johnson v. Domingues, supra,* 82 Md.App. at 131 n. 1, 570 A.2d 369. The findings to which the court referred are as follows:

1. There has been a significant change of circumstance since the Judgment of Absolute Divorce was filed on December 23, 1986. At that time and until the summer of 1988, both parties lived in Montgomery County. The [mother] has now moved to San Antonio, Texas.

2. The [mother's] husband interferes with the relationship between the minor children and the [father].

3. The [mother] does nothing to further the relationship between the [father] and the parties' children.

4. The [mother] and her husband are making every effort to establish their family to the exclusion of the [father].

5. The [mother] has refused to communicate with the [father] even when such communication is reasonably

necessary to protect the children's well-being, for example, in regard to her remarriage.

6.  Any change in economic circumstances has been due to voluntary decisions on the [mother's] part.

7.  There has been no significant increase in the [mother's] expenses for the children except insofar as she has attributed costs of housing, furniture, swimming pool, and her husband's car to the children.

The Court of Special Appeals took too narrow a view of the "facts" found by the master that should be presumed correct and rejected only if unsupported by the record or otherwise clearly erroneous. Judge Moylan, writing for the Court of Special Appeals in *Wenger v. Wenger*, 42 Md.App. 596, 402 A.2d 94 (1979), carefully reviewed the respective functions of the chancellor and a master in a domestic relations case. The Court there drew a distinction between "first-level facts," which should be accepted unless clearly erroneous, and "more abstract, second-level, conclusory or dispositional facts," which are not entitled to such deference. 42 Md.App. at 607, 402 A.2d 94. Though certainly accurate in the context used, that language suggests a rather simplistic distinction between first-level and second-level fact-finding that may, as we believe was the case here, prove misleading.

A finding that A shot B is rather easily identified as a finding of fact. A finding that A intentionally shot B is also a finding of fact, even though the ultimate fact may have been found by the use of inferences drawn from other known facts. A finding that a witness did not testify truthfully is a finding of fact that a master may make, even though it is to some extent an opinion or conclusion, often drawn from a variety of observations and inferences. Moreover, perception of the character of any given statement may vary depending upon the form in which it appears. Compare, "I find as a fact the witness testified falsely," with "In my opinion, the witness testified falsely," or "I conclude that the witness testified falsely."

In *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348 (1985), we discussed the diversity of opinion concerning the meaning of the phrase "factual findings" in Fed.R.Evid. 803(8). We said at 303 Md. 609, 495 A.2d 348:

> The line between "fact" and "opinion" is often difficult to draw. An investigating body may hear diametrically opposed testimony on the question of whether one person or another struck the first blow, and proceed to decide the issue as a finding of "fact." That determination necessarily has a judgmental quality, and differs, for example, from a finding of fact that a certain number of persons suffered burns from ignition of clothing fabric during a given period. Conclusions found in reports need not be judgmental. A conclusion that there has been a significant increase in fabric-related burn injuries is essentially factual if the datum shows a 60% increase. Thus, attaching labels of "fact" or "opinion" or "conclusion" will not necessarily resolve the issue, and careful attention must be given to the true nature of the statement and the totality of circumstances bearing on the ultimate issue of reliability.

Three years later, in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), the Supreme Court considered the same problem, and said:

> It has frequently been remarked that the distinction between statements of fact and opinion is, at best, one of degree:
>
> > "All statements in language are statements of opinion, i.e., statements of mental processes or perceptions. So-called 'statements of fact' are only more specific statements of opinion. What the judge means to say, when he asks the witness to state the facts, is: 'The nature of this case requires that you be more specific, if you can, in your description of what you saw.'" W. King & D. Pillinger, Opinion Evidence in Illinois 4 (1942) (footnote omitted), quoted in 3 J. Weinstein & M. Berger, Weinstein's Evidence § 701[01], p. 701–6 (1988).

See also E. Cleary, McCormick on Evidence 27 (3d ed. 1984) ("There is no conceivable statement however specific, detailed and 'factual,' that is not in some measure the product of inference and reflection as well as observation and memory"); R. Lempert & S. Saltzburg, A Modern Approach to Evidence 449 (2d ed. 1982) ("A factual finding, unless it is a simple report of something observed, is an opinion as to what more basic facts imply").

With the possible exception of the use of the word "significant" in the first finding, we view the seven listed findings of the master to be findings of fact entitled to deference under the clearly erroneous rule. Moreover, there are additional findings of fact by the master included in the section of her report entitled "Conclusions and Opinion," which should be given the same deference.

The mother contends that many of the facts found by the master have no foundation in the record. This is a threshold problem for the chancellor. Concededly, it is difficult for an exceptant to prove a negative averment. On the other hand, the chancellor should not be required to conduct an unassisted search of the entire record for testimony that would support each challenged finding. To the extent that the master's report does not provide reference to the underlying testimony upon which a finding is based, the party responding to an exception of this type should specify those portions of the record upon which he or she relies to demonstrate an adequate foundation for that finding.

The chancellor must carefully consider the mother's allegations that certain findings of fact are clearly erroneous, and decide each such question. The chancellor should, in an oral or written opinion, state how he resolved those challenges. Having determined which facts are properly before him, and utilizing accepted principles of law, the chancellor must then exercise independent judgment to determine the proper result.

As we have attempted to make painfully clear, the burden cast upon a chancellor in a case of this kind is substantial. The necessity that the chancellor rule on challenges to findings of fact which may involve testimony spread throughout hundreds of pages of transcript, the difficulty of making a decision as to the best interest of a child without personally observing the witnesses, and the critical nature of the decision that must be made, as well as the wide discretion that is necessarily afforded that decision by the appellate courts, all speak to the care and attention that must be given the case by a chancellor.

Although the use of masters has proven beneficial in a variety of cases, the question of the advisability of referring contested custody cases to a master in those instances where the trial court has discretion to do so, is one that should be carefully considered.[3] If a chancellor must essentially duplicate the effort and dedication of time of a master in order to ultimately decide a case, nothing has been gained by referral to the master. On the other hand, if, because of the expertise of the master, or for other reasons, parties often accept the recommendation of the master and exceptions are infrequently filed, the use of a master may be advisable.

---

3. The Family and Domestic Relations Subcommittee of the Court's Standing Committee on Rules of Practice and Procedure recently studied the matter of referral of contested custody cases to masters. The subcommittee initially favored a proposal that in courts regularly using masters, custody and visitation issues should be identified at an early stage of the case and referred for mediation, and that if mediation proved inappropriate or unsuccessful those issues should be tried by the court as soon as possible, with the remaining issues then referred to a master. Memorandum of 11 September 1990 from Una M. Perez, Reporter, to members of the subcommittee and consultants. The recommendation that contested custody issues be tried by the court was reconsidered and rejected by the subcommittee however, and was not, therefore, presented to the full Rules Committee or to this Court. At present, circuit courts continue to have the discretion to refer original contested divorce cases involving custody to masters, and requests for modification of custody are referred as a matter of course where a court has a standing master. *See* Maryland Rules 2-541(b) and S74A a. (2).

We return to the question of the disposition to be made in this case. Ordinarily, when an appellate court finds that the lower court has misapplied the law, the appropriate action is to remand the case for further consideration. The Court of Special Appeals determined that a remand was not necessary in this case, except to determine the father's rights of visitation, because it found there was insufficient evidence of a change in circumstances to justify a modification of the previous custody order. As indicated above, we do not agree.

The Court of Special Appeals, while recognizing that the mother's remarriage, the current attitude of the mother and her new husband with respect to the father and his relationship with the children, and the mother's move to Texas, constituted changes in circumstances, nevertheless concluded that because neither those nor any other changes shown by the evidence had been proven to have had any demonstrable adverse effect upon the children up to the time of the hearing, this could not be considered a change of circumstances affecting the welfare of the children. That view of "change" is unduly restrictive.

As we discussed in *McCready v. McCready*, 323 Md. 476, 593 A.2d 1128 (1991), the principle that an existing custody order ordinarily should not be modified in the absence of a showing of changes affecting the welfare of the children has two bases: preventing relitigating of the same issues and, the preservation of stability in custody cases. We pointed out that "the question of 'changed circumstances' may infrequently be a threshold question, but is more often involved in the 'best interest' determination, where the question of stability is but a factor, albeit an important factor to be considered." 323 Md. at 482–483, 593 A.2d at 1131.

In this case, we are persuaded there was sufficient evidence of changes relating to the welfare of the children to justify a full consideration of whether modification of

custody was required, and the parties were not simply attempting to relitigate issues earlier resolved. To determine that a modification is required, the chancellor need not find, as the Court of Special Appeals suggests, that the changes have already caused identifiable harm to the children. It is sufficient if the chancellor finds that changes have occurred which, when considered with all other relevant circumstances, require that a change in custody be made to accommodate the future best interest of the children.

A determination of custody requires an element of prediction. Whether it is the parties attempting to reach an agreement, or a chancellor resolving a custody dispute, the aim is necessarily to structure custody and visitation to accommodate the future best interest of the child. Indeed, it has been suggested that a weakness of the "best interest of the child" standard is the need for prediction.

> Today, almost all states use a best-interests-of-the-child standard. That standard has several significant weaknesses. First, it is indeterminate and speculative. Judges must make an individualized prediction about the future—with which parent will this child be better off in the years to come? (Footnotes omitted.)

Singer & Reynolds, *A Dissent on Joint Custody* 47 Md. L.Rev. 497, 519 (1988). See also Wexler, *Rethinking the Modification of Child Custody Decrees* 94 Yale L.J. 757, 762 (1985), observing that "custody litigation, unlike most other litigation, attempts to predict the future rather than to understand the past." In *Montgomery County v. Sanders*, 38 Md.App. 406, 419, 381 A.2d 1154 (1978), Chief Judge Gilbert wrote for the Court of Special Appeals that:

> The best interest standard is an amorphous notion, varying with each individual case, and resulting in its being open to attack as little more than judicial prognostication. The fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future.

A change in circumstances which, when weighed together with all other relevant facts, requires a court to revise its view of what is in the future best interest of a child, is a sufficient change. It is neither necessary nor desirable to wait until the child is actually harmed to make a change which the evidence shows is required. Clearly, change is not to be lightly made. The benefit to a child of a stable custody situation is substantial, and must be carefully weighed against other perceived needs for change. This is a part of the difficult weighing process that is the responsibility of the chancellor.

■ The Court of Special Appeals also held that the mother's relocation to Texas could not constitute a change in conditions sufficient to justify a change in custody. In so holding, the intermediate appellate court referred to its earlier opinion in *Jordan v. Jordan,* 50 Md.App. 437, 439 A.2d 26, *cert. denied,* 293 Md. 332 (1982). It also quoted with approval the following statement of a New Jersey judge in *Hoyt v. Boyar,* 5 Fam.L.Rptr. 2135, 2135–36 (N.Y.Fam.Ct., Sullivan County, 1979), *modified on other grounds,* 77 A.D.2d 685, 429 N.Y.S.2d 792 (1980):

> Relocating as a result of remarriage, employment and the like cannot of itself render a parent to whom custody has been granted unfit and thereby constitute the basis for a modification of custody.

As the New York Court of Appeals has said, "[t]he only absolute in the law governing custody of children is that there are no absolutes." *Friederwitzer v. Friederwitzer,* 55 N.Y.2d 89, 447 N.Y.S.2d 893, 895, 432 N.E.2d 765, 767 (1982). The statement approved by the Court of Special Appeals strikes us as far too absolute in its terms. In the first place, it is not necessary that a parent be declared unfit before joint or sole custody can be changed from that parent. Moreover, changes brought about by the relocation of a parent may, in a given case, be sufficient to justify a change in custody. The result depends upon the circumstances of each case.

The understandable desire of judges and attorneys to find bright-line rules to guide them in this most difficult area of the law does not justify the creation of hard and fast rules where they are inappropriate. Indeed, the very difficulty of the decision-making process in custody cases flows in large part from the uniqueness of each case, the extraordinarily broad spectrum of facts that may have to be considered in any given case, and the inherent difficulty of formulating bright-line rules of universal applicability in this area of the law.

The relocation of a parent having joint or primary physical custody may present serious questions concerning modification of a custody order, and the approach of the courts of the several states to this problem has not been uniform. *See* Raines, *Joint Custody and the Right to Travel: Legal and Psychological Implications* 24 J.Fam.L. 625 (1985–86); Spitzer, *Moving and Storage of Postdivorce Children; Relocation, The Constitution and The Courts,* 1 Ariz.St.L.J. 1 (1985); Note *Post–Divorce Child Custody and Family Relocation,* 9 Harv.Women's L.J. 135 (1986); Note, *Residence Restrictions On Custodial Parents: Implications For The Right To Travel,* 12 Rutgers L.J. 341 (1980). In some states the courts jealousy protect the right of travel, and place a heavy burden upon the parent who would challenge the relocation. In other states, the burden is placed upon the parent contemplating relocation to show that it would be in the best interest of the child. The legislatures of some states have enacted "anti-removal" statutes. *See, e.g., Schwartz v. Schwartz,* 812 P.2d 1268 (Nev.1991) discussing Nev.Rev.Stat. § 125A.350.

The view that a court takes toward relocation may reflect an underlying philosophy of whether the interest of the child is best served by the certainty and stability of a primary caretaker, or by ensuring significant day-to-day contact with both parents. Certainly, the relationship that exists between the parents and the child before relocation is of critical importance. If one parent has become the primary caretaker, and the other parent has become an occa-

sional or infrequent visitor, evidencing little interest in day-to-day contact with the child, the adverse effects of a move by the custodial parent will be diminished. On the other hand, where both parents are interested, and are actively involved with the life of the child on a continuing basis, a move of any substantial distance may upset a very desirable environment, and may not be in the best interest of the child. Professor Raines suggests that "in light of current psychological research, moving children away from one parent, after a successful joint custody arrangement has been instituted, is rarely in a child's best interest." Raines, *supra*, 24 J.Fam.L. at 630. Justice Fuchsberg, writing for the Court of Appeals of New York in *Weiss v. Weiss*, 52 N.Y.2d 170, 436 N.Y.S.2d 862, 865, 418 N.E.2d 377, 380 (1981), stated:

> How valuable the mature guiding hand and love of a second parent may be to a child is taught by life itself. This is surely so when the parent-child relationship is carefully nurtured by a regular, frequent and welcomed visitation as here....

In the present case, there was evidence that the father had a very close relationship and strong bonds with the children. Although the father did not have equal physical custody, he did have, and regularly exercised, extensive rights of visitation. As a result, the children spent substantial periods of time with each parent. The close relatives of the children, maternal and paternal, with whom the children had enjoyed close contact, reside in this area. Additionally, there was evidence that the attitude and conduct of the mother and her husband were likely to exacerbate the adverse effects of a physical separation of the children from their father, to the detriment of the children.

The issue of stability cuts both ways in this case. Continued custody in the mother, the primary caretaker in fact, certainly offers an important form of stability in the children's lives. However, permitting the children to remain in an area where they have always lived, where they may continue their association with their friends, and where they

may maintain frequent contact with their extended family, also provides a form of stability. These are but some of the factors that the chancellor must consider. The issue, we conclude, is one that cannot be determined as a matter of law. The case must be remanded to the chancellor for further consideration.

There are, however, several additional issues that were presented to the Court of Special Appeals by the mother's original appeal, but not decided by that court because of the disposition it made. Those issues were not before us, and thus, we remand for further consideration by the Court of Special Appeals, and thereafter for remand to the chancellor.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO DATE IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE-HALF BY EACH PARTY.