750 A.2d 624

**Leslie K. BRAUN**

v.

**Jeffrey David HEADLEY.**

**No. 405, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

April 26, 2000.

Francis A. Pommett, III, Baltimore, for appellant.

Todd K. Mohink (Law Offices of David L. Ruben, on the brief), Ellicott City, for appellee.

Argued before DAVIS, HOLLANDER and ADKINS, JJ.

ADKINS, Judge.

We must determine in this appeal whether the Court of Appeals's decision in *Domingues v. Johnson*, 323 Md. 486, 593 A.2d 1133 (1991), which holds that the relocation of a child may constitute a change in circumstances sufficient to trigger a review of custody, applies a standard that violates a custodial parent's constitutional right to travel. Relying on the Supreme Court's recent decision in *Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), appellant argues that *the Domingues* standards must be modified.[1] Appellant further argues that we should reverse the decision of the Circuit Court for Harford County to transfer custody from Leslie K. Braun, appellant, to Jeffrey David Headley, appellee, after appellant's relocation from Maryland to Arizona, because the change in custody was not in the best interests of the child.

## FACTS AND LEGAL PROCEEDINGS

The minor child, Theresa, was born on November 11, 1993. Appellant filed a complaint to prove paternity and establish child support on May 11, 1994, naming appellee as the father. Following the determination that appellee was the father, custody was awarded to appellant and appellee was ordered to pay approximately $316 monthly in child support.[2] Appellee was granted reasonable visitation, and subsequently, a visitation schedule was established. The visitation order of March 7, 1995, initially granted appellee visitation from 9:00 a.m. Saturday morning until 9:00 p.m. Saturday evening for two consecutive Saturdays, and then every other weekend with rotating holidays.

---

1. Appellant points out that she did not make an argument based on *Saenz* in the trial court because *Saenz* was not decided until after the trial of this case. In light of the timing of the *Saenz* decision, and in order to provide guidance to lower courts, we will exercise our discretion to decide the issue pursuant to Maryland Rule 8-131.

2. Arrears were established at the amount of $1,645 as of October 21, 1994, and were to be paid back at $31.58 monthly.

On October 16, 1998, appellant moved to Arizona. On that same date, appellant filed a complaint to modify visitation stating that due to her "chronic pain" and "illness," she had "decided to move" to a "dryer climate, which [would] enable her to better tolerate her various health problems." Appellant also contended in the motion that visitation should thereafter "be conditioned on [appellee] paying all transportation costs incident to such visitation, in advance; or, providing round-trip airline tickets for each scheduled visitation." Appellee filed an answer and a counter-complaint for sole custody and/or for modification of custody, requesting an emergency custody hearing. A hearing was set for and held on December 16, 1998, and the matter was continued. On December 17, 1998, the court ordered that assessments of both parties and Theresa be conducted by the Office of Family Court Services. On January 26, 1999, the hearing was held to receive the report of John Mahlmann, Ph.D, of the Office of Family Court Services. Dr. Mahlmann interviewed the parties and Theresa, and recommended that "both parties attend the Divorce Education Program" and that each party have a "psychological evaluation." After receiving the report from the doctor, the court concluded that a trial was necessary. The court ordered that appellant, appellee, and Theresa each have a psychological evaluation by Dr. Michael Gombatz, and the evaluations were scheduled.[3] Subsequently, the court appointed an attorney for Theresa. A two-day trial was held in mid-April.

At the trial, Dr. Gombatz's report was admitted into evidence. Dr. Gombatz reported that on February 23, 1999, for the scheduled joint interview with both parties, appellant "was approximately a half hour to an hour late." He stated that appellant "interrupted several times" during appellee's presentation. He stated that appellant was "inflexible unless it was to her advantage," and that she "was consistently vague and non-responsive ... [and] it appeared that [appellant] did deny [appellee] visitation, rationalizing the reasons for it."

---

3. Appellee was ordered to pay the cost of these evaluations, not to exceed $1,500.

After conversing with Dr. Mahlmann, Dr. Gombatz reported that there was no record of any current significant health conditions facing Theresa, contradicting appellant's diagnosis that Theresa had asthma. Nor was Theresa being treated for asthma. When questioned by Dr. Gombatz as to why she "appear[ed] not to be telling me the truth?" appellant answered: "It is very oppressive. I'm tired of it."

The doctor also conducted individual evaluation sessions of each of the parties, first with Theresa, and then alone. Again, appellant "arrived over an hour late" for the appointment, and stated that, "It was not my fault." When Dr. Gombatz interviewed Theresa alone, appellant, "instead of going into the waiting room like I asked, [ ] put her ear against the door in an attempt to listen to our conversation." Shortly after the questioning began, the doctor left the office to get appellant and "was startled to see her standing by the door." Dr. Gombatz reported that appellant "started berating" him regarding his questioning of Theresa.

Dr. Gombatz reported that appellee's "clinical profile was essentially within normal limits" and his "projective testing is valid." In contrast, appellant's

clinical profile suggests borderline-narcissistic personality disorder. Her scores suggest deficits in mood stability, relationships and particularly with her own sense of identity.... She tends to experience intense emotions and frequent mood swings with recurring periods of depression, anxiety and anger followed by dejection and apathy.... In addition, [appellant] is quite self-centered. She has an expectation entitlement which, if given the opportunity she will exploit people and manipulate them. She ... thinks primarily of herself.... Projective testing indicates she has deficiencies in her capacity for control and tolerance for stress.

Dr. Gombatz recommended that appellee "is the more competent parent and Theresa's interests would be served if custody and placement were with him." His reasons included his finding that appellant acts "as if Theresa is her property

... rather than a young girl whose development is to be fostered." He further reported: (1) "There is ... no doubt in my mind that the move to Arizona was precipitated by a desire to limit Theresa's contact with her birth father. The claim that she moved to Arizona for Theresa's medical benefit ... has no merit;" (2) appellee "has a healthier relationship with Theresa than" appellant; and (3) appellee "would likely be much fairer in allowing Theresa contact with [appellant] than [she] would be with him."

Both appellant and appellee testified at trial, as well as other witnesses called by each side. Appellee described the circumstances of appellant's move to Arizona, and how she notified him by telephone message on her day of departure that she was leaving, but failed to provide any information about her new residence until about six weeks later. After appellee learned of appellant's new residence and telephone number, he made frequent attempts to call Theresa, but appellant substantially and repeatedly interfered with his ability to speak with the child. Appellee also described how Theresa would not call him dad or other appropriate name, and addressed him without any appellation. Wade Headley, Theresa's paternal grandfather, testified that Theresa said that "if I call him Daddy, I will get punished at home." Appellee's mother also described how appellant made Theresa give away toys and other gifts, including a picture painted by her, that were given to Theresa by her paternal grandparents. Appellee testified that Matthew, appellant's son from another relationship, repeatedly referred to him as "Doo-doo."

Appellant described the early history of Theresa's life, and emphasized how appellee had originally denied his paternity of Theresa. She ascribed her move to Arizona to health reasons, explaining that she thought that Theresa had asthma, and that the drier climate would be better for Theresa.[4] Although

---

**4.** Although in her complaint appellant asserted that the move was to improve her personal health, she offered no evidence to support this claim, other than a statement that she had done general research and learned that a drier climate was beneficial to health.

Theresa's medical records were introduced into evidence, appellant was unable to point to any indication in the records that Theresa suffered from asthma. She testified that Theresa did not like to visit with her father. She acknowledged giving away the gifts from Theresa's grandparents, indicating that she did not have sufficient room in her residence to store all the "junk" that a child accumulated. She acknowledged that Matthew referred to appellee as "Doo–Doo."

On April 20, 1999, the court issued an opinion from the bench that awarded custody of Theresa to appellee, and reserved visitation with appellant "until further order of this [c]ourt." This appeal was timely noted.

Additional facts will be added as necessary to our discussion of the issues.

## DISCUSSION

### I.

### Standard of Review

A trial court cannot, in the exercise of its discretionary power, infringe upon constitutional rights enjoyed by the parties. *See Lewis v. Warden,* 16 Md.App. 339, 342, 296 A.2d 428 (1972). Because appellant asserts that her right to travel under the United States Constitution is implicated, our standard of review in considering this issue (in Section II of this opinion) shall be an independent constitutional appraisal. *See Ebert v. Md. St. Bd. of Censors,* 19 Md.App. 300, 316, 313 A.2d 536 (1973).

Our review of the issue of whether the trial court erred in holding that the best interests of Theresa called for an award of custody to appellee shall be governed by the abuse of discretion standard. The determination of which parent should be awarded custody rests within the sound discretion of the trial court. *See Robinson v. Robinson,* 328 Md. 507, 513, 615 A.2d 1190 (1992). The court's exercise of discretion must be guided first, and foremost, by what it believes would promote the child's best interest. *See Kemp v.*

*Kemp,* 287 Md. 165, 170, 411 A.2d 1028 (1980). Additionally, the trial court's opportunity to observe the demeanor and credibility of both the parties and the witnesses is of particular importance. *See Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994).

When a trial court finds that the moving party has satisfied the burden and established a justification for a change in custody, those findings must be accorded great deference on appeal, and will only be disturbed if they are plainly arbitrary or clearly erroneous. *See Scott v. Dep't of Social Services,* 76 Md.App. 357, 382–83, 545 A.2d 81, *cert. denied,* 314 Md. 193, 550 A.2d 381 (1988).

## II.

### Custody and Right to Travel

Appellant argues that the Supreme Court's recent decision in *Saenz, supra,* requires a change in Maryland law respecting the consideration of one parent's relocation of residence for purposes of deciding whether custody should be modified. She contends that the *Domingues* holding that relocation of residence by a parent could itself constitute the basis for a finding of a material change in circumstances is no longer valid. She asserts that the *Domingues* standard violates a person's constitutional right to travel, as recently defined in *Saenz.* Appellant insists that in the present case the court ordered a change of custody based exclusively on her relocation, thereby violating her constitutional rights. We hold, for the reasons set forth below, that the standards established by the Court of Appeals in *Domingues* do not violate the rights of a custodial parent to travel.

*The Domingues* Court was called upon to evaluate our holding in *Jordan v. Jordan,* 50 Md.App. 437, 439 A.2d 26, *cert. denied,* 293 Md. 332 (1982), that relocation of a parent cannot constitute the basis for a modification of custody. *See Domingues,* 323 Md. at 500, 593 A.2d 1133. In so doing, the Court examined our statement in *Jordan* that "[r]elocating as a result of remarriage, employment and the like cannot of

itself render a parent to whom custody has been granted unfit and thereby constitute the basis for a modification of custody." *Id.* at 500, 593 A.2d 1133 (quoting *Jordan,* 50 Md.App. at 447, 439 A.2d 26, in turn quoting *Hoyt v. Boyer,* 5 Fam. L. Rptr. 2135, 2135–36 (N.Y. Fam. Ct. Sullivan County, 1979), *modified on other grounds,* 77 A.D.2d 685, 429 N.Y.S.2d 792 (1980)). The Court, overruling our holding in *Jordan,* observed:

> The statement approved by the Court of Special Appeals strikes us as far too absolute in its terms. In the first place, it is not necessary that a parent be declared unfit before joint or sole custody can be changed from that parent. Moreover, changes brought about by the relocation of a parent may, in a given case, be sufficient to justify a change in custody. The result depends upon the circumstances of each case.
>
> The understandable desire of judges and attorneys to find bright-line rules to guide them in this most difficult area of the law does not justify the creation of hard and fast rules where they are inappropriate. Indeed, the very difficulty of the decision-making process in custody cases flows in large part from the uniqueness of each case, the extraordinarily broad spectrum of facts that may have to be considered in any given case, and the inherent difficulty of formulating bright-line rules of universal applicability in this area of the law.

*Domingues,* 323 Md. at 500–01, 593 A.2d 1133.

■ The Supreme Court has recognized the importance of a citizen's right to travel between states, *see e.g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *overruled in part, Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This right includes the right "to migrate, resettle, find a new job, and start a new life...." *Shapiro,* 394 U.S. at 629, 89 S.Ct. at 1328. Although the treatment and handling of a custodial parent's decision to relocate has been addressed by many jurisdictions, *see* Carol S. Bruch and Janet M. Bowermaster, *The Reloca-*

*tion of Children and Custodial Parents: Public Policy, Past and Present,* 30 Fam. L.Q. 245 (1996) (and cases cited therein), only a few courts have considered how the custodial parent's right to travel plays a role in a court's decision regarding custody under these circumstances. *See* Tabitha Sample and Teresa Reiger, *Relocation Standards and Constitutional Considerations,* 10 J. Am. Acad. Matrim. Law. 229, 237 (1998) ("Sample and Reiger"). Like many other states, our Court of Appeals has thoroughly addressed the issue of relocation by a custodial parent, and has clearly set forth the standard and burden of proof involved in making determinations of this issue, *see Domingues, supra; McCready v. McCready,* 323 Md. 476, 593 A.2d 1128 (1991), but has not been called upon to address the constitutional right to travel in this context.[5]

The right to travel is not explicitly set forth in the United States Constitution, but the Supreme Court "long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro, supra,* 394 U.S. at 629, 89 S.Ct. at 1329.

---

**5.** The constitutional right to travel was asserted before this court in *Schaefer v. Cusack,* 124 Md.App. 288, 722 A.2d 73 (1998), but was not our basis for decision. In *Schaefer we* reviewed a trial court order awarding custody of a minor child to one parent for a period of years, but changing custody to the father when the child completed fifth grade. The order also required that the parents live within forty-five miles of each other. The mother, who was awarded custody, appealed from the order, contesting, *inter alia,* the requirement that she live within forty-five miles of the father. She asserted several constitutional rights, including the right to travel, as well as arguing that the trial court had no jurisdiction to grant such request. We struck down the forty-five mile limitation, holding that "the best interest of the child can be determined better at the time a relocation is proposed than in an attempt to look into the future and to say now that the best interest of the child requires a present determination that a separation of the parents by more than forty-five miles would have an adverse effect upon the child." *Id.* at 307, 722 A.2d 73. We did not address the constitutional right to travel argument.

## The Supreme Court's *Saenz* Decision

The Supreme Court revisited the right to travel in *Saenz, supra,* when the Court was called upon to interpret the constitutionality of a statute that limited the maximum welfare benefits available to state residents who had resided in a state under twelve months. Under the statute, residents would receive only the amount of benefits they would have received in the state of their prior residence for the first year that they resided in their new home state. Two California residents filed an action challenging the minimum residency requirement of the statute.

California argued that the statute was not enacted for the purpose of inhibiting migration and that "it does not penalize the right to travel because new arrivals are not ineligible for benefits during their first year of residence." *Saenz,* 526 U.S. at 499, 119 S.Ct. at 1525. The state further argued that it would save millions of dollars in annual welfare costs, and that this "was an appropriate exercise of budgetary authority as long as the residency requirement did not penalize the right to travel." *Id.* at 497, 119 S.Ct. at 1523. California argued that the statute should be upheld if it is supported by a rational basis and the state's interest in saving millions of dollars meets that test. *See id.* at 500, 119 S.Ct. at 1525.

The Supreme Court took this opportunity to address the issue of the right to travel. According to *Saenz,* "[t]he word 'travel' is not found in the text of the Constitution. Yet the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." *Id.* at 498, 119 S.Ct. at 1524 (citation omitted). "[T]he right is so important that it is 'assertable against private interference as well as governmental action ... a virtually unconditional personal right....'" *Id.* (quoting *Shapiro,* 394 U.S. at 643, 89 S.Ct. at 1336 (Stewart, J. concurring)).

The right to travel "embraces at least three different components." *Id.* at 500, 119 S.Ct. at 1525. The Court explained the components as: (1) the right of a citizen of one state to enter and leave another state; (2) the right of a citizen of one

state "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present" in the state; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of" the state. *Id.* Although the precise source of this right is obscure, *see Shapiro,* 394 U.S. at 630 n. 8, 89 S.Ct. at 1329 n. 8, it originated out of concern over state discrimination against outsiders, rather than concerns over the general ability to travel interstate. *See Saenz,* 526 U.S. at 497–99, 119 S.Ct. at 1524.

In contrast to appellant, the *Saenz* plaintiffs were the subject of discrimination because their rights to welfare benefits from the state were automatically limited by their move to California, regardless of their need for welfare. As the Court said:

> Neither the duration of respondents' California residence, nor the identity of their prior States of residence, has any relevance to their need for benefits. Nor do those factors bear any relationship to the State's interest in making an equitable allocation of the funds to be distributed among its needy citizens.

*Id.* at 507, 119 S.Ct. at 1528.

The component of the right to travel implicated in *Saenz* rests on the first sentence of Article IV, § 2 of the Constitution, which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." It was the "third aspect of the right to travel—the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State," *id.* at 502, 119 S.Ct. at 1526, that was implicated by the discriminatory welfare classification. The welfare classification based on duration of residence was held a violation of the right to travel and a penalty "since the right to travel embraces the citizen's right to be treated equally in her new State of residence . . . ." *Id.* at 505, 119 S.Ct. at 1527.

In contrast, the *Domingues* Court created no discriminatory classification between those who are already residents of a

state, and those who migrate to that state for residence.[6] The Court simply recognized that a determination of custody is a multi-faceted decision, but that the best interests of the child must override all other competing interests, including the parent's interest in retaining custody, if a relocation would be adverse to the child. For this reason, we do not see *Saenz* as shedding new light on the subject of how the right to travel should interplay with the concerns of a court in addressing the best interests of the child in the context of a custodial parent's relocation.

### The Constitutional Right to Travel Is Qualified

■ We think, however, that the constitutional right to travel should not be ignored in custody decisions involving the decision of one parent to relocate. Our research discloses only a few other jurisdictions in which the constitutional right to travel was asserted to defend against a change in custody based on a proposed relocation by the custodial parent. In the few cases that we have found where the constitutional right to travel was asserted, the court found that the right was implicated under such circumstances. *See LaChapelle v. Mitten,* 607 N.W.2d 151, 163 (Minn.App.2000); *In Re Custody of D.M.G. and T.J.G.,* 287 Mont. 120, 951 P.2d 1377, 1381 (1998); *In Re Marriage of Cole,* 224 Mont. 207, 729 P.2d 1276, 1280 (1986); *Jaramillo v. Jaramillo,* 113 N.M. 57, 823 P.2d 299, 304 (1991); *In Re Marriage of Sheley,* 78 Wash.App. 494, 895.P.2d 850 (1995); *overturned on other grounds, In re Marriage of Littlefield,* 133 Wash.2d 39, 940 P.2d 1362 (1997); *Watt v. Watt,* 971 P.2d 608, 615–16 (Wyo.1999). *See also* Sample and Reiger, *supra;* Paula M. Raines, *Joint Custody and the Right to Travel: Legal and Psychological Implications,* 24 J. Fam. L. 625, 630–638 (1985–86) ("Raines"); Arthur B. LaFrance, *Child Custody and Relocation: A Constitutional Perspective,* 34 U. Louisville J. Fam. L. 1, 67–80 (1995–96) ("LaFrance").

Most of these cases, in recognizing the role of the constitutional right to travel, hold that the right to travel is qualified,

---

**6.** The constitutional right to travel was not asserted by the relocating custodial parent in *Domingues.*

and must be subject to the state's compelling interest in protecting the best interests of the child by application of the best interests standard. *See LaChapelle,* 607 N.W.2d 151; *Cole,* 729 P.2d 1276; *D.M.G.,* 951 P.2d 1377; *Jaramillo,* 113 N.M. 57, 823 P.2d 299; *cf. Sheley,* 78 Wash.App. 494, 895 P.2d 850 (right to travel is qualified by state's compelling interest in protecting best interests of children, but to meet constitutional test, requires showing of detriment to child if relocation is made).

Only one case, *Watt,* finds a "best interests" analysis insufficient recognition of the parental right to travel, and holds that the threshold requirement that a material change of circumstances exists, which triggers the best interest analysis, cannot be established merely by proving relocation of the custodial parent. In *Watt,* the Supreme Court of Wyoming placed a higher priority on the constitutional right to travel than other states discussing the right:

> The constitutional question posed is whether the rights of a parent and the duty of the courts to adjudicate custody serve as a premise for restricting or inhibiting the freedom to travel of a citizen of the State of Wyoming and of the United States of America. We hold this to be impossible. The right of travel enjoyed by a citizen carries with it the right of a custodial parent to have the children move with that parent. This right is not to be denied, impaired, or disparaged unless clear evidence before the court demonstrates another substantial and material change of circumstance and establishes the detrimental effect of the move upon the children. While relocation certainly may be stressful to a child, the normal anxieties of a change of residence and the inherent difficulties that the increase in geographical distance between parents imposes are not considered to be 'detrimental' factors.

*Id.* at 615–16 (citations omitted).

The other cases addressing the constitutional right of travel, and its interplay with the best interests standard accord a lower priority to the constitutional right, and in doing so,

apply standards that are consistent with the Court of Appeals decision in *Domingues*.

The intermediate appellate court of Minnesota has recognized that the constitutional right to travel is implicated in child custody disputes involving relocation, but the right must be balanced against the state's interests in protecting the best interests of the child:

> The right to travel includes the right to 'live and settle down anywhere one chooses in this country without being disadvantaged because of that choice.' The nature of the disadvantage or hardship involved is important to the level of review a restriction on the right to travel receives. In this case the hardship imposed on [the custodial parent] is the loss of sole physical custody of her daughter if she does not return to Minnesota. This implicates the fundamental right to raise one's child, which triggers the application of strict scrutiny.
>
> The deprivation of fundamental rights is subject to strict scrutiny and may only be upheld if justified by a compelling state interest. The compelling state interest in this case is the protection of the best interests of the child.

*LaChapelle*, 607 N.W.2d at 163 (citations omitted). In rejecting an equal protection argument by the mother, the court reasoned:

> The equal protection guarantees prevent the government from making distinctions among people when applying the law unless the distinction serves a legitimate governmental interest. In Minnesota, custody decisions are based on the best interests of the child. The focus in applying the best-interests standard is on the child, not the parents, and therefore the standard applies equally to all parents.

*Id.* at 165; *cf. Cole*, 729 P.2d at 1280 (furthering the "best interests of the child, by assuring the maximum opportunities for the love, guidance and support of both natural parents may constitute a compelling state interest," but "interference with the fundamental right" to travel must be made "cautiously").

In *Jaramillo*, the parties, as part of their divorce proceedings, entered a stipulation that they would share joint legal

custody of their daughter, Monica, which provided that Monica was to reside with her mother each week, and with her father on alternate week-ends, Wednesdays, and certain holidays. The mother advised the father that she planned to move from New Mexico, where the parties both lived, to New Hampshire, "where her parents lived and where she believed she could find steadier and more remunerative employment." *Id.* at 301. In the custody litigation that followed, both parents sought primary physical custody. In addressing the interplay between the constitutional right to travel and the competing concerns of the state—in the best interests of the child, and the non-custodial parent—in maintaining close association and frequent contact with the child, the Supreme Court of New Mexico said:

> [T]he protection afforded the right to travel in the child-custody context has been explicitly recognized by . . . this Court. . . . [I]t makes no difference that the parent who wishes to relocate is not prohibited outright from doing so; a legal rule that operates to chill the exercise of the right, absent a sufficient state interest to do so, is as impermissible as one that bans exercise of the right altogether.

> \* \* \*

> By the same token, we believe that the other parent's right to maintain his or her close association and frequent contact with the child should be equally free from any unfavorable presumption that would place him or her under the burden of showing that the proposed removal of the child would be contrary to the child's best interests. '[F]reedom of personal choice in matters of family life is a fundamental liberty interest.' *Santosky v. Kramer*, 344 [455] U.S. 745, 753, 102 S.Ct. 1388, 1394 [71 L.Ed.2d 745] (1982).

*Id.* at 305–06 (citations omitted).

The court rejected the notion that a relocation after the parents' divorce is presumptively contrary to the child's best interest, saying:

We think that such a presumption is potentially just as inimical to the child's best interests as the opposite presumption favoring the relocating parent and burdening the resisting parent with the requirement that he or she prove that the move would be contrary to the child's best interests.

*Id.* at 307.

It went on to explain why neither a presumption in favor of, nor a presumption against the custodial parent's right to relocate should be indulged:

Neither presumption ... serves the ... goal ... [o]f determining and implementing the best interests of the child. [One] presumption prefers the interest of the remaining parent to that of the relocating parent; the opposite presumption reverses the preferences assigned to these interests. Both presumptions are subject to the following criticism leveled by the United States Supreme Court several years ago at 'procedure by presumption':

Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.

(quoting *Stanley v. Illinois*, 405 U.S. 645, 656–57, 92 S.Ct. 1208, 1215 [31 L.Ed.2d 551] (1972)).

*Id.* (citations omitted). It went on to adopt the rule that "neither party is under a burden to prove which arrangement will best promote the child's interests; both parents share equally the burden of demonstrating how the child's best interests will be served." *Id.* at 308. In adopting this rule, it recognized that:

[E]ither party can initiate a proceeding to alter an existing custody arrangement on the ground that a substantial and material change in circumstances affecting the welfare of the child has occurred or is about to occur, and the party

seeking such change has the burden to show that the existing arrangement is no longer workable. In almost every case in which the change in circumstances is occasioned by one parent's proposed relocation, the proposed move will establish the substantiality and materiality of the change. It then becomes incumbent on the trial court to consider as much information as the parties choose to submit, or to elicit further information on its own motion from the sources mentioned above or such other sources as the court may have available, and to decide what new arrangement will serve the child's best interest. In such a proceeding neither parent will have the burden to show that relocation of the child with the removing parent will be in or contrary to the child's best interests. Each party will have the burden to persuade the court that the new custody arrangement or parenting plan proposed by him or her should be adopted by the court, but that party's failure to carry this burden will only mean that the court remains free to adopt the arrangement or plan that it determines best promotes the child's interests.

*Id.* at 309.

After review of the Supreme Court decisions in *Saenz* and *Shapiro,* the out of state cases addressing the issue, as well as commentary on the issue,[7] we conclude that the standard set forth in *Domingues* for deciding custody disputes involving a parental relocation does not interfere with a custodial parent's right to travel. The Supreme Court has given no indication that the constitutional right to travel should be paramount over the state's interest in preserving the best interests of the children. Indeed, the state's duty to protect the interests of minor children has been recognized by the Supreme Court as "duty of the highest order." *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).

---

**7.** We have reviewed several articles discussing the constitutional right to travel and how it is or should be applied in custody determinations. *See* Sample and Reiger, *supra;* LaFrance, *supra;* Raines, *supra.*

■ We consider the reasoning of the Supreme Court of New Mexico in *Jaramillo* to be the most cogent analysis of the appropriate interplay between the constitutional right and the family law concerns, because it articulates why a presumption favoring either the relocating custodial parent or the non-custodial parent would upset the balance that is needed to arrive at a fair determination of the child's best interests. There is no constitutional infirmity in giving equal status, in determining the child's best interests, to (1) the custodial parent's right to travel, and the benefit to be given the child from remaining with the custodial parent; and (2) the benefit from the non-custodial parent's exercise of his right to maintain close association and frequent contact with the child.

### Treatment of the Right to Travel Under *Domingues*

Although the Court of Appeals in *Domingues* was not presented with an argument based on the constitutional right to travel, and did not rule on the constitutional issue, it did mention the "right to travel" in its opinion, and made reference to commentaries [8] discussing the right. In describing the law in other jurisdictions, the Court of Appeals said:

> In some states the courts jealously protect the right of travel, and place a heavy burden upon the parent who would challenge the relocation. In other states, the burden is placed upon the parent contemplating relocation to show that it would be in the best interest of the child. The legislatures of some states have enacted 'anti-removal' statutes.

*Domingues,* 323 Md. at 501, 593 A.2d 1133 (citation omitted).

Further, its reasoning regarding the best way, for non-constitutional reasons, to determine the best interests of the child when proposed relocation is involved, is based on the

---

**8.** The Court cited the following commentaries: Raines, *supra,* 24 J. Fam L. 625 (1985–86); Spitzer, *Moving and Storage of Postdivorce Children; Relocation, the Constitution and the Courts,* 1 Ariz. St. L.J. 1 (1985); Note, *Residence Restrictions On Custodial Parents: Implications For the Right to Travel,* 12 Rutgers L.J. 341 (1980). All of these commentaries discuss the constitutional right to travel.

fundamental concept, also evident in the *Jaramillo* constitutional analysis, that there are no "absolutes" other than the best interests of the child. *See Domingues*, 323 Md. at 501, 593 A.2d 1133; *Jaramillo*, 823 P.2d at 309 n. 10 ("The respective interests of the parents are relevant . . . and should be considered by the court; but the interests of the child take precedence over any conflicting interest of either parent."). The Court of Appeals explained how the competing interests of the parents might be viewed differently, depending on the circumstances presented:

> The view that a court takes toward relocation may reflect an underlying philosophy of whether the interest of the child is best served by the certainty and stability of a primary caretaker, or by ensuring significant day-to-day contact with both parents. Certainly, the relationship that exists between the parents and the child before relocation is of critical importance. If one parent has become the primary caretaker, and the other parent has become an occasional or infrequent visitor, evidencing little interest in day-to-day contact with the child, the adverse effects of a move by the custodial parent will be diminished. On the other hand, where both parents are interested, and are actively involved with the life of the child on a continuing basis, a move of any substantial distance may upset a very desirable environment, and may not be in the best interest of the child.

*Id.* at 501–02, 593 A.2d 1133.

We conclude that the approach taken by the Court of Appeals in *Domingues* sufficiently protects the constitutional right to travel because it requires consideration of that right, and gives the parent choosing to exercise that right an equal footing as the other parent with respect to the burden to show the best interests of the children. Accordingly, we see no reason, based on *Saenz, supra,* or the right to travel, as recognized in other Supreme Court decisions, to modify the standards for considering relocation cases from that set forth in *Domingues*.

## III.

### Material Change in Circumstances

Appellant argues that under the circumstances of this case, her relocation to Arizona did not warrant a material change in circumstances sufficient to order a change in custody, and that the trial court based its finding of change solely on her relocation. She also asserts that she "seems to be extraordinarily adept at rubbing people ... the wrong way" and that the judge's dislike for her in conjunction with admiration for appellee amounts to a "popularity contest" and was the reason for the custody transfer. We disagree. The record makes clear that, in deciding to transfer custody, the trial court carefully considered all the evidence before it with a view towards determining the best interests of the child. It considered the relocation to Arizona, and the effect the move would have on Theresa. Its decision that the change in circumstances, when considered in light of Theresa's best interests, warranted a change in custody, was well supported by the evidence.

The threshold issue is the existence of a material change. A change of custody resolution is generally "a chronological two-step process." *Wagner v. Wagner,* 109 Md.App. 1, 28, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996). Initially, unless a material change of circumstances is found to exist, the court's inquiry must cease. *See id.* If a material change is found to exist, "then the court, in resolving the custody issue, considers the best interest of the child as if it were an original custody proceeding." *Id.*

In determining whether the change was material we look to whether the changes related to the welfare of the child. *See McCready, supra,* 323 Md. at 481, 593 A.2d 1128. The factors to be considered in determining custody of a child include,

> but [are] not limited to: (1) fitness of the parents; (2) character and reputation of the parties; (3) desire of the natural parents and agreements between the parties; (4)

potentiality of maintaining natural family relations; (5) preference of the child; (6) material opportunities affecting the future life of the child; (7) age, health and sex of the child; (8) residences of parents and opportunity for visitation; (9) length of separation from the natural parents; and (10) prior voluntary abandonment or surrender.

*Montgomery County v. Sanders,* 38 Md.App. 406, 420, 381 A.2d 1154 (1977) (citations omitted). As we discussed in Section II, changes "brought about by the relocation of a parent may, in a given case, be sufficient to justify a change in custody." *Domingues,* 323 Md. at 500, 593 A.2d 1133; *see also Goldmeier v. Lepselter,* 89 Md.App. 301, 309, 598 A.2d 482 (1991).

The record contains considerable evidence that appellant actively sought to interfere with or prevent appellee from having a relationship with Theresa, and that she had no appreciation for the need of her daughter to have a relationship with her father. Further, Dr. Gombatz's report contained significant information regarding appellant's personality that negatively influenced her ability to serve as the custodial parent. The trial court considered Dr. Gombatz's report, and observed that appellant's

> conduct is totally consistent with the diagnosis that Dr. Gombatz had given me so that I used Dr. Gombatz'[s] report not as a primary tool in making a decision in this case but as a back up tool, as a test, and the diagnosis and observations made by Dr. Gombatz are consistent with and confirm the observations that I made in this courtroom. The diagnosis of borderline personality disorder ... produces a personality that is extremely difficult to work with.
>
> [Appellant] does what she perceives to be right and fair and just and simply doesn't consider what anyone else wants.... [S]he [acts] with what is consistent with her own interests and the testimony that I heard bears that out and Dr. Gombatz simply confirms it.

The trial court determined that a change in circumstances had occurred, and that it was material. The court found that:

(1) appellant moved to Arizona with the intent to "separate the child from the father" to place "distance between the child and the father" and "to avoid contact between father and child;" (2) there was "no evidence that there is a health issue on the part of either the child or [appellant] that justified the move.... [T]he child does not have asthma;" (3) appellant was an "unreliable" witness with "totally inappropriate" demeanor on the witness stand on "many" occasions, and "is not a reliable fact giver;" (4) appellant "left the state of Maryland without giving prior notice" to appellee; (5) appellant "does discourage the child from calling [appellee] 'Dad' and from addressing the grandparents in appropriate terms as 'grandmother' or 'granddad'"; (6) "Matthew does refer to [appellee] in derogatory terms in front of Teresa," and Matthew's low opinion of appellee is "based exclusively upon the information that [appellant] has provided to these children;" and (7) appellant "is avoiding telephone calls" from appellee to Theresa, and that she "is unwilling to communicate with [appellee] in any reasonable way."

The court considered highly significant its finding that appellant "gave no consideration to the impact of her conduct on either the child or herself." It observed that

"[t]here was no thought given to the consequences of removing the child from the State of Maryland without resolving the visitation issue.... There has been no consideration on [appellant's] part from what the impact of blocking access of this child to this father would be. And it's simply because she doesn't like [appellee] and [she] is very angry at [appellee] over his failure to follow through to get married.... And I find that [appellant] *is simply unable to separate her own needs from the needs of the child.*"

(Emphasis added).

We believe the evidence before the trial court supported its findings that appellant did not consider Theresa's best interests prior to moving the child out of the State of Maryland, and that she is incapable of separating her own interests from the best interests of her child. The relocation from Maryland

is a modification that will particularly effect Theresa's best interests because of appellant's unwillingness to cooperate to foster a good relation between Theresa and her father. If Theresa were to live in a distant state with appellant, it would be easier for appellant to undermine Theresa's relationship with her father. Similarly, the long distance would make it harder for appellee to overcome the obstacles created by appellant. The potential for maintaining natural family relations is one factor to be considered in determining custody of a child. *See Montgomery County,* 38 Md.App. at 420, 381 A.2d 1154. As discussed in Section II, the relocation of appellant to another state, can, under Maryland law, constitute the material change in circumstances necessary to trigger the best interests analysis. *See Domingues,* 323 Md. at 500–03, 593 A.2d 1133. This case presents the proto-type of an instance when a relocation meets the *Domingues* and constitutional standards.

The trial court had the opportunity to observe the witnesses, and view all of the evidence. We cannot say that the trial court abused its discretion in concluding that there had been a material change in circumstances, and the best interests of Theresa warranted a modification of appellant's parental rights. Based on its factual findings, the court's award was not clearly erroneous. *See Lemley v. Lemley,* 109 Md.App. 620, 627–628, 675 A.2d 596 (1996) ("A chancellor's decision founded upon sound legal principles and based upon factual findings that are not clearly erroneous will not be disturbed in the absence of a showing of a clear abuse of discretion.").

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**